# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 05-2425

KEITH A. ROBERTS, APPELLANT,

V.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued October 23, 2008; July 29, 2009                    Decided April 23, 2010)

*Robert P. Walsh,* of Battle Creek, Michigan, for the appellant. *Christine M. Cote*, of Washington, D.C., filed the initial brief.

*Debra L. Bernal*, with whom *Paul J. Hutter*, Acting General Counsel; *R. Randall Campbell*, Assistant General Counsel; *Carolyn F. Washington,* Deputy Assistant General Counsel, were on the brief, all of Washington, D.C., for the appellee.

*Sandra W. Wischow*, of Richmond, Virginia, was on the brief for the National Organization of Veterans' Advocates, Inc., as amicus curiae.

Before GREENE, *Chief Judge*, and KASOLD, HAGEL, MOORMAN, LANCE, DAVIS, and SCHOELEN, *Judges*.

GREENE, *Chief Judge*, filed the opinion of the Court. HAGEL, *Judge*, filed an opinion concurring in part and dissenting in part in which SCHOELEN, *Judge*, joined. LANCE, *Judge*, filed an opinion concurring in part and dissenting in part.

GREENE, *Chief Judge*: Veteran Keith A. Roberts appeals through counsel an August 26, 2005, decision of the Board of Veterans' Appeals (Board) that determined that it was proper for a VA regional office (RO) to sever his May 1998 award of VA service connection for post-traumatic stress disorder (PTSD) with dysthymia and depression based on findings of fraud and clear and unmistakable error (CUE). The Board also (1) denied an effective date prior to July 16, 1992, for the grant of service connection for PTSD with dysthymia and depression, (2) denied separate compensable ratings for dysthymia and depression, (3) dismissed Mr. Roberts' motions that various

other RO decisions were based on CUE, and (4) denied compensation for his tobacco use, alcohol abuse, a digestive disorder, erectile dysfunction, an eye disorder, obesity, chronic fatigue syndrome, a personality disorder, a cardiovascular disorder, a pulmonary disorder, and arthritis of the right knee, all claimed as secondary to PTSD. Record (R.) at 1-41.

Because the Board correctly found that Mr. Roberts' award of service connection was based on fraud and, based on the finding, permissibly severed that award of service connection after providing him notice and an opportunity to respond in compliance with both the general due process procedures set forth in 38 C.F.R. § 3.103 and its own internal procedures provided in the *VA Adjudication Procedures Manual* (M21-1MR), the Court will affirm that part of the August 2005 Board decision that determined that severance of Mr. Roberts' award of service connection for PTSD with dysthymia and depression was proper. Further, because the Board failed to consider whether Mr. Roberts' dysthymia and depression were directly related to service, that part of the Board decision denying Mr. Roberts' claim for separate compensable disability ratings for dysthymia and depression will be set aside and the matters remanded for further adjudication. The remainder of the Board's decision will be affirmed.

## I. BACKGROUND

Mr. Roberts served honorably in the U.S. Navy from March 1968 to December 1971. His military entrance medical examination noted no psychiatric abnormalities. A December 13, 1969, medical treatment note states that Mr. Roberts had been examined after he fell into a ditch. The treatment note indicates that, at that time, Mr. Roberts smelled of liquor and was "combative [and] boisterous." R. at 60. The medical report records that, as treatment, he was injected with Thorazine, placed into a straightjacket, and then placed into bed restraints overnight.

### A. Death of Gary Holland

During a March 1991 VA psychiatric examination, Mr. Roberts reported that on February 4, 1969, while serving in Naples, Italy, he witnessed the accidental death of his friend Gary Holland, which occurred in an airplane hangar when parts of an airplane fell on and crushed Mr. Holland. Mr. Roberts stated to the examiner that "he was arrested for damaging the plane while trying to extricate his friend." R. at 159. In his report, the examiner noted that there was nothing in Mr. Roberts'

2

service record regarding "this incident." *Id.* Mr. Roberts also reported that in December 1969, he had been "arrested, placed in a straight jacket and restraints by the shore patrol," an incident that the examiner noted was "corroborated in [Mr. Roberts'] records and in a report of a brief psychiatric hospitalization." *Id.* The examiner opined that Mr. Roberts had dysthymia with irritability and mixed personality disorder with antisocial and borderline features.

### B. Claims for Personality Disorders and PTSD

In August 1993, Mr. Roberts claimed VA disability compensation for an acute personality disorder, which he stated began in December 1969. During a September 1993 VA mental disorders examination, Mr. Roberts again reported that he continued to be haunted by his friend's accidental death. The VA examiner concluded that Mr. Roberts suffered from dysthymia, alcohol abuse, and mixed personality disorder with borderline and antisocial features.

In February 1994, Mr. Roberts amended his claim to include service connection for PTSD. He submitted to the RO a letter recounting that one day in January 1969, while he was in charge of the line shack, which was responsible for directing planes and rescue missions at the Naval Air Station in Naples, Gary Holland, his "very good friend," was working on the nose wheel of a plane when his coat became entangled on a safety pin that released the front end of the plane, causing it to fall and crush him. R. at 282. Mr. Roberts specifically reported:

> I proceeded to sound the alarm, ran over to the plane to assess the situation at which time I found Gary still conscious and coherent. I informed him I would get him out and then proceeded to run next door to the ground support unit, informed a chief petty officer of the situation and ordered him to bring a cherry picker to the front of the hanger to lift the plane.
>
> As I was returning to the hanger I confronted my 1st class superior and informed him to place a ladder at the rear hatch of the plane and load men into the tail section to relieve the front[.] I then proceeded to the front of the plane and instructed the [ground support engineering] chief to puncture the radome of the plane to lift it up[.] [A]t this time a [lieutenant commander] who informed me he was the safety officer ordered me to stop [and] when I refused, he had me placed into arrest by a Marine guard[.] The [lieutenant commander] then proceeded to have air bags place under the plane to lift it, this took approx 10-12 minutes[. . . .] The [lieutenant commander] stated that it was more important to save the plane than it was to save the man. When the plane had risen enough, I broke away from the guard and I and another shipmate proceeded under the plane and extradited [sic] Gary to an awaiting corpsman who gave Gary a shot of Adren[a]lin[e] in the heart. He was then

3

transported by chopper to the NATO Hospital where he passed away the next day (brain dead).

I have always believed Gary would have lived had I not be[en] thwarted in my rescue attempts.

R. at 282-83. Subsequently, Mr. Roberts provided to the RO a death report certifying that Gary Doyle Holland died on February 5, 1969, as a result of multiple contusions of the head and chest that occurred when "the nose wheel strut failed and collapsed while he was working in the nose compartment of a VC-54S aircraft, thus pinning him to the sides and top or back of the nose compartment." R. at 372.

In March 1998, Mr. Roberts underwent a VA PTSD examination, during which he again reported witnessing his friend's death. In the resulting medical report, the examiner stated that Mr. Roberts' claims file had been reviewed and that his PTSD stressor had been verified by the RO. The examiner recorded that Mr. Roberts' "mood was seriously depressed and affect was blunted[, t]hought processes were clear and organized and thought content was obsessed with the death of his friend, Gary." R. at 378. Based on these findings, the examiner diagnosed Mr. Roberts as having, inter alia, chronic PTSD.

### C. RO's Award of Service Connection for PTSD

In May 1998, after finding that Mr. Roberts' reported stressor–witnessing the death of his friend Gary Holland–was credible and had been corroborated, the RO awarded service connection for PTSD. The RO assigned a 50% disability rating for the condition, effective August 4, 1993 (the date Mr. Roberts claimed service connection for a personality disorder). Mr. Roberts disagreed with the disability rating and, in May 1999, the RO awarded him a 100% disability rating for PTSD with dysthymia and depression, effective August 4, 1993.

In February 2002, Mr. Roberts requested reconsideration of the effective date for service connection for PTSD. He also claimed service connection for several other medical conditions secondary to his service-connected PTSD, which the RO denied. In June 2002, the RO determined that an effective date before August 4, 1993, was not warranted. Mr. Roberts appealed, and in September 2002 submitted a motion to revise several RO decisions on the basis of CUE . In March 2003, the effective date was changed to July 16, 1992, based on the RO's finding that Mr. Roberts

had submitted an informal claim on that date. Mr. Roberts again disagreed with the effective date assigned.

## D. Claim for Dysthymia and Depression

As he sought an effective date earlier than July 16, 1992, Mr. Roberts also claimed VA benefits for dysthymia and depression, separate from PTSD. That claim was denied in a February 2003 RO decision on the basis that 38 C.F.R. § 4.14 barred separate ratings or "pyramiding" for these already secondarily service-connected conditions. Mr. Roberts disagreed with the decision.

## E. July 2004 Inspector General's Report

In January 2004, Mr. Roberts complained to the VA Office of the Inspector General (IG) Office of Investigations that VA had mishandled his claim. The IG investigated Mr. Roberts' complaint and, in July 2004, issued a lengthy report finding that Mr. Roberts' claims file revealed inconsistencies surrounding his claimed in-service stressor. The investigator discovered that the 1969 Navy Judge Advocate General Corps (JAG) accident report concerning Gary Holland's death did not mention Mr. Roberts witnessing Mr. Holland's death and did not identify Mr. Roberts among the persons interviewed by the Navy JAG investigator. The investigation report further noted that Gary Holland's roommate stated that "neither he nor [Gary] Holland was friendly with [Mr.] Roberts," despite Mr. Roberts having reported Gary Holland to be a "good friend." R. at 1629.

The IG investigator interviewed several witnesses to Gary Holland's death who had been identified by the Navy JAG investigator's report. All of the witnesses testified that Mr. Roberts was not present at the scene of the accident. The IG investigator also interviewed Petty Officer Samuel Chiarella, who supervised all of the shops in the hangar where Mr. Holland was killed. Petty Officer Chiarella reported that he knew both Gary Holland and Mr. Roberts and that he did not remember seeing Mr. Roberts at the accident scene. The investigator also interviewed William W. Stewart, who was the airframes shop chief petty officer at the time of the 1969 accident and who also served as commander of 12 men in the branch, including Gary Holland. Mr. Stewart stated that he did not know Mr. Roberts and that Mr. Roberts did not work in the same shop as Gary Holland. Mr. Stewart's account was corroborated by both Lieutenant Commander Harold R. Trusdale and Paul W. Solomon, the quality assurance officer at the time of the accident.

5

The IG investigator further interviewed the Navy JAG investigator, Lieutenant Commander Fuchs, another witness who stated that immediately after the accident he had reported to the accident scene and interviewed all personnel present who had witnessed the accident or participated in the rescue operations. When asked by the IG investigator if any personnel at the scene might not have been interviewed, Lieutenant Commander Fuchs replied that "all present were accounted for and interviewed." R. at 1642. The IG investigator also questioned Mr. Roberts, who maintained that he was the first person to arrive at the accident scene and that he had directed the rescue efforts. Mr. Roberts stated that at that time he had been interviewed for more than an hour by the Navy JAG officer in charge of the investigation. After a later interview, the IG investigator reported that Mr. Roberts became angry during that interview when he was informed that other witnesses had stated that he was not at the scene of the accident.

## F.  Proposed Severance of PTSD Award

In August 2004, after considering the IG's findings, the RO concluded that Mr. Roberts had committed fraud in presenting his claim for PTSD, and the RO proposed to sever that award. Specifically, the RO determined that Mr. Roberts' accounts of "witness[ing] the accidental injury of Gary Holland, and having participated in the rescue operations of Gary Holland, are found to be fraudulent in light of the additional documentation received from the IG." R. at 1331. Mr. Roberts was advised of the Secretary's proposed action, and in September 2004 he submitted a statement requesting that the Secretary not sever his service connection "until such said proposed severance can be appealed" to the Board. R. at 1337-40, 1354. In a November 2004 letter to the RO, Mr. Roberts argued that under this Court's caselaw, he needed only to show that he was stationed at the military unit where the claimed in-service stressor supporting his PTSD claim occurred and was not required to corroborate his physical proximity to the claimed stressor. During a June 2005 hearing before the Board, Mr. Roberts testified that when he filed his PTSD claim, he had presented the RO with two other stressors–specifically, being held in a straightjacket and being hospitalized and treated with Thorazine.

## G.  August 2005 Board Decision

In its August 2005 decision, the Board, inter alia, determined that it was proper for the RO to sever Mr. Roberts' award of VA benefits on the basis of fraud. In doing so, the Board set forth the following two-step analysis:

6

> First, the Board must determine whether the protection of the rating may be overcome. That essentially involves inquiry into fraud on the part of the veteran in applying for service connection. Assuming the rating is no longer protected, the Board must then look at the propriety of the severance itself. That involve[s] inquiry into the matter of whether service connection was established based on CUE.

R. at 14. Applying this analysis, the Board first determined that because Mr. Roberts' award of service connection for PTSD had an effective date of July 16, 1992, and thus, had been in effect for more than 10 years before the November 2004 RO decision, the award was potentially qualified for protection under 38 U.S.C. § 1159 and 38 C.F.R. § 3.957. The Board noted that a protected award of service connection cannot be severed "except upon a showing that the original grant was based on fraud or it is clearly shown from military records that the person concerned did not have the requisite service or character of discharge." R. at 15 (citing § 3.957). The Board reasoned that fraud, for purposes of § 3.957, is defined as "an intentional misrepresentation of fact, or the intentional failure to disclose pertinent facts, for the purpose of obtaining or retaining . . . eligibility for [VA] benefits, with knowledge that the misrepresentation or failure to disclose may result in the erroneous award or retention of such benefits." *Id.* (citing 38 C.F.R. § 3.1(aa)(2) (2005)). Considering the definition of fraud, the Board concluded that, based on evidence in the IG report, Mr. Roberts' statements "that he not only was present at the accident scene but initially led the rescue attempt [of Mr. Holland], made in connection with his claim for VA monetary benefits, is unquestionably and manifestly false." R. at 19. Therefore, the Board found that Mr. Roberts' original award of service connection for PTSD was based on a stressor that was false, which rendered his award of service connection unprotected under § 3.957. The Board then considered the RO's severance action.

The Board agreed that severance was proper under any one of the following three alternative theories: (1) The May 1998 RO decision granting service connection for PTSD was clearly and unmistakably erroneous as the statutory or regulatory provisions then in effect were not properly applied; (2) the May 1998 RO decision was based on CUE because the correct facts, as they were known at the time, were not before the adjudicator; and (3) § 3.105(d) severs service connection based on a change in diagnosis, and a November 2004 VA medical opinion concluded that Mr. Roberts no longer had PTSD.

Also in the decision here on appeal, the Board denied Mr. Roberts' claims for entitlement to an effective date earlier than July 1992 for his PTSD and for VA benefits for tobacco use, alcohol

abuse, a digestive disorder, erectile dysfunction, an eye disorder, obesity, chronic fatigue syndrome, a personality disorder, a cardiovascular disorder, pulmonary disorder, and arthritis of the right knee, all claimed as secondary to PTSD. The Board concluded that as Mr. Roberts was no longer service connected for PTSD, these conditions could not be secondarily service connected. R. at 32-33, 38-40. The Board also denied his claims for separate compensable ratings for dysthymia and depression because "the assignment of separate ratings under 38 C.F.R. § 4.25 assumes and requires the existence of a service[-]connected disability," and since Mr. Roberts filed his claim for separate ratings, service connection for PTSD with dysthymia and depression had been severed; therefore there was no legal basis to provide separate ratings. R. at 33-34. This appeal followed.

## II. CONTENTIONS OF THE PARTIES[1]

Mr. Roberts argues that the Court should either review de novo and reverse the Board's determination that he committed fraud or remand the matters to require the Board to provide an adequate statement of reasons or bases. In supplemental briefing, he also asserts for the first time that the Board erred by determining that he had committed fraud without first referring the matter to the IG, the VA Office of the General Counsel (OGC), and a Title 5 administrative law judge (ALJ) in accordance with 31 U.S.C. §§ 3801-3812 and 38 C.F.R. § 42.1 et seq. Alternatively, he contends that the Board's determination that there was CUE in the May 1998 RO decision granting him service connection for PTSD with dysthymia and depression, which the Board reached by applying 38 C.F.R. § 3.105(d), was arbitrary, capricious, and contrary to law. He contends that the Board's statement of reasons or bases for this conclusion was inadequate because, inter alia, VA did not obtain shore patrol reports or otherwise attempt to corroborate additional events as potential PTSD stressors. He also maintains that the Board erred by relying on what he believes is an inadequate medical examination. Finally, he urges the Court to vacate the remainder of the Board decision because the matters are inextricably intertwined with the issue of severance of service connection.

---

[1] On June 8, 2009, the parties were ordered to provide memoranda of law addressing, inter alia, the question whether 38 C.F.R. § 3.105(d) applies to severing service connection once the Secretary determines that because of fraud the veteran's service connection is no longer protected under 38 C.F.R. § 3.957. The Court also requested the participation of amici. Subsequently, in response to a Court order, the parties filed supplemental memoranda of law regarding the relevance, if any, of the forfeiture provisions of 38 U.S.C. § 6103(d)(1).

8

The Secretary contends that the Court is collaterally estopped from addressing whether Mr. Roberts' use of Gary Holland's accidental death as a stressor was indeed fraudulent because the same issue has been litigated and decided by the U.S. District Court for the Eastern District of Wisconsin. He further asserts that Mr. Roberts' alternative arguments are either moot or meritless. According to the Secretary, the process for severing service connection set forth in § 3.105(d) is not applicable to cases in which a finding of fraud has been made.[2] He argues that the introductory language of § 3.105 removes the procedural safeguards set forth in subsection (d) from cases where it has been established that a claimant fraudulently received VA benefits. He asserts that, where fraud is involved, the applicable procedural processes are instead found in 38 C.F.R. § 3.103. Consequently, he asserts that the Board's decision should be affirmed.

### III. DISCUSSION

#### A. The Board's Finding of Fraud

The record does not support Mr. Roberts' contention that the Board erred in finding fraud. "Fraud" is defined by VA regulation as an

> intentional misrepresentation of fact, or the intentional failure to disclose pertinent facts, for the purpose of obtaining or retaining, or assisting an individual to obtain or retain, eligibility for Department of Veterans Affairs benefits, with knowledge that the misrepresentation or failure to disclose may result in the erroneous award or retention of such benefits.

38 C.F.R. § 3.1(aa)(2) (2009 & 2005). Although Mr. Roberts suggests that the Court review this determination de novo, a finding of fraud is a factual determination reviewed under the "clearly erroneous" standard of review. *See Farless v. Derwinski*, 2 Vet.App. 555, 556 (1992). A finding of fact is clearly erroneous when the Court, after reviewing the entire evidence, "'is left with the definite and firm conviction that a mistake has been committed.'" *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

In finding that Mr. Roberts had fraudulently secured the award of VA benefits, the Board reviewed all of the statements made by Mr. Roberts "in conjunction with his original claim and in

---

[2] The Secretary acknowledges that this position differs from his initial presentation to the Court that the Board properly applied § 3.105(d). He states that upon further review of the regulatory history of § 3.105, it is evident that "by its own terms, . . . § 3.105, including § 3.105(d), is inapplicable in cases, such as the instant one, where severance of service connection is predicated on fraud." Secretary's Memorandum of Law at 1-4.

conjunction with the RO's actions to sever service connection." The Board also considered Mr. Roberts' February 1994 PTSD questionnaire, the evidence included in the 1969 Navy investigation report, and in the July 2004 IG's investigation report. Relying on the substance of this evidence, the Board concluded that Mr. Roberts' 1994 statement that he had been present at the scene of Mr. Holland's accidental death and led the ultimately unsuccessful rescue attempt was "unquestionably and manifestly false." R. at 19. The Board found "particularly significant" Mr. Roberts' shifting account of his being the primary player in the rescue attempt to his assertion that he need only to show that he was stationed at the Naples Naval Air Station at the time of the incident; the Board concluded that this shifting account lead "inevitably to the conclusion that either his initial statements of direct involvement were intentionally false, or the more recent statements of merely being on base are intentionally false." R. at 21. Either way, the Board determined that Mr. Roberts' statements was intentionally false and were made to obtain or retain VA benefits.

The Board further determined that there was "no question" that Mr. Roberts had knowledge that his false statements might result in the erroneous award or retention of VA benefits because he had been notified several times by VA that his claim for compensation for PTSD had been denied for lack of an in-service stressor. *Id.* Therefore, the Board concluded that Mr. Roberts' award of VA benefits for PTSD were based on a fraudulent single stressor–Gary Holland's accidental death.

It is the Board's duty to weigh the evidence. *Burger v. Brown*, 5 Vet.App. 340, 342 (1993) ("The [Board], as factfinder, is required to weigh and analyze all the evidence of record."). Here, to conclude that Mr. Roberts intentionally misrepresented the truth for the purpose of securing VA benefits and thus to find fraud, the Board relied on the inconsistencies in Mr. Roberts' account of the 1969 in-service incident, the contradictions in Mr. Roberts' statements as disclosed in the IG report, and Mr. Roberts' statements made in support of his claim for benefits Based on the record as a whole, the Board's findings are plausible and not clearly erroneous, and its statement of reasons or bases is understandable and facilitative of judicial review. *See Farless*, 2 Vet.App. at 566; *Gilbert, supra*; *see also Allday v. Brown*, 7 Vet.App. 517, 527 (1995) (Board's statement "must be adequate

to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court").[3]

### B. 31 U.S.C. §§ 3801-3812 and 38 C.F.R. § 42.1 et seq.

In supplemental briefing, Mr. Roberts argues for the first time that the Board erred by making a fraud determination in this matter in the first instance. He asserts that allegations of fraud should be referred to the IG, the OGC, and a Title 5 ALJ in accordance with 31 U.S.C. §§ 3801-3812 and 38 C.F.R. § 42.1 et seq. In October 1986, Congress enacted the Program Fraud Civil Remedies Act (PFCRA), Public Law 99-509 (codified at 31 U.S.C. §§ 3801-3812) to establish an administrative remedy against any person who makes, or causes to be made, a false claim or written statement to certain Federal agencies. However, under § 42 of the implementing regulation, no allegations of liability may be referred to an ALJ if the false claims or false statements resulted in a monetary gain of more than $150,000. 38 C.F.R. § 42.6(a)(2) (2009); *see also* 38 U.S.C. § 3803(c)(1). Because Mr. Roberts was paid over $320,000 in VA benefits as a result of his fraudulent statements, *United States v. Roberts*, 534 F.3d 560, 563 (7th Cir. 2008), the Board did not err by making its fraud determination without first referring the issue to an ALJ.

### C. Severance of Service Connection for Fraud

Mr. Roberts also argues that, after the Board made its fraud determination, the Board erred in finding under 38 C.F.R. § 3.105 that there was CUE in the 1998 RO decision. Responding to the Secretary's contention that we need not address these arguments because § 3.105 does not apply to cases of fraud, Mr. Roberts notes that although § 3.957 permits severing VA benefits for fraud, it also states that the 10 year period is to be computed "after compliance with § 3.105(d)." He insists that the Board did not comply with the requirement in § 3.105(d) that severance could occur only when the evidence showed that service connection was "clearly and unmistakably erroneous." As discussed below, we reject Mr. Roberts' arguments.

---

[3] Although the Court may take judicial notice of the fraud determination made by U.S. District Court for the Eastern District of Wisconsin, *see Brannon v. Derwinski*, 1 Vet.App. 314, 316 (1991) ("Courts may take judicial notice of facts of universal notoriety, which need not be proved, and of whatever is generally known within their jurisdictions."), having found no error in the Board's determination that Mr. Roberts committed fraud in securing VA benefits for his PTSD, we need not address the Secretary's argument that the Court is bound by the district court's finding, which postdated the decision of the Board.

*1. 38 C.F.R. § 3.105 does not apply in cases of fraud.*

Initially, the Court already has held that where a prior award is later found to be "clearly illegal," compliance with the provisions of § 3.105 is not necessary because that subsection does not apply to such cases. *Allen v. Nicholson*, 21 Vet.App. 54, 61-62 (2007) (holding that § 3.105(d) need not be addressed where claimant does not have the requisite service)*; Venturella v. Gober*, 10 Vet.App. 340, 342 (1997) (holding that the provisions of 38 C.F.R. § 3.105(a) and (d) do not apply when the claimant does not possess the requisite service because there is no legal entitlement to service connection); 38 C.F.R. § 3.105 (2009) ("The provisions of this section apply except where ... the evidence establishes that service connection was clearly illegal.").  Moreover, the language of § 3.105, its history, and its place in the regulatory scheme support the Secretary's assertion that it is not applicable in cases of fraud.

a. Interplay Between § 3.105(d) and § 3.957

Although subsection (d) of § 3.105 specifically addresses revisions of decisions where service connection is severed, it also explicitly states that it is "[s]ubject to the limitations contained in[, inter alia,] § 3.957."  38 C.F.R. § 3.105(d).  Section 3.957 states:

> Service connection for any disability or death granted or continued under title 38 U.S.C., which has been in effect for 10 or more years will not be severed except upon a showing that the original grant was based on fraud or it is clearly shown from military records that the person concerned did not have the requisite service or character of discharge.  The 10-year period will be computed from the effective date of the Department of Veterans Affairs finding of service connection to the effective date of the rating decision severing service connection, after compliance with § 3.105(d).

38 C.F.R. § 3.957 (2009)[4] (implementing 38 U.S.C. § 1159).

Mr. Roberts' argument that the last sentence of § 3.957 quoted above requires compliance with the substantive procedures of § 3.105(d) before service connection may be severed based on fraud is not persuasive.  By the very wording of § 3.957, compliance with § 3.105(d) is required only with regard to computing the 10-year period for determining whether an award is protected from

---

[4] In its current form, 38 C.F.R. § 3.957 has undergone no substantive changes since 1968 when it was amended to extend the protection of service connection in force for 10 years or more to claims for dependency and indemnity compensation or death compensation.

severance.[5]   Thus, when, as here, a veteran has been service connected for a disability for over 10 years before any severance action, the severance may not take place *except* when, as pertinent hereto, the award of service connection was based on fraud.  Otherwise stated, § 3.957 applies only when VA's proposed severance of service-connected benefits is on a basis *other than* fraud or lack of requisite service, and then only when a disability has been service connected for more than 10 years.  In such cases, § 3.957 prohibits the severance of service connection.  Here, however, the severance action is predicated on fraud, and § 3.957 therefore is not applicable, other than to *permit* such severance to take place even though Mr. Roberts' PTSD has been service connected for more than 10 years.

b. Language and History of § 3.105

The language of § 3.105 explicitly states that the section applies "*except* where an award was based on an act of commission or omission by the payee."  38 C.F.R. § 3.105 (emphasis added). Proffering fraudulent statements for the intended purpose of procuring VA benefits constitutes acts of commission or omission under § 3.105.  An act of "commission" is the "act of committing or doing; perpetration, as of a crime" and an "omission" is a "failure to do something."  BLACK'S LAW DICTIONARY 1116 (7th ed. 1999); WEBSTER'S NEW WORLD DICTIONARY 280 (3d ed. 1988).  An act of "fraud" is defined by regulation as the "intentional misrepresentation of fact, or the intentional failure to disclose pertinent facts," 38 C.F.R. § 3.1(aa)(2), and by legal treatise as the "intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some[thing] of value]," 37 C.J.S. *Fraud* § 1 (2008).  More generally, "fraud comprises all acts, omission, and concealments involving a breach of legal or equitable duty and resulting in damage to another." *Id.* It embraces "all the multifarious means which human ingenuity can devise and are resorted to by one individual to gain an advantage over another by false suggestions or by suppression of truth."  *Id.* (citing *Ragland v. Shattuck Nat'l Bank*, 36 F.3d 983 (10th Cir. 1994)).  Accordingly, acts of fraud fit clearly within the definition of "acts of commission or omission."

---

[5] Section 3.105(d) provides a time period within which a claimant may submit evidence to show that service connection should be maintained, and states that if the evidence is not received during that period, then a final rating action may be taken reducing or discontinuing the award.  The computation of the 10-year period is not at issue here. It is undisputed that service connection for the appellant's award had been in effect for more than 10 years when the RO proposed severance.

The regulatory history of § 3.105 supports the argument that the regulation is not for application in cases of fraud. In 1936, VA Regulation and Procedural Rule (R. & P. R)-1009 (currently 38 C.F.R. § 3.105(d)), which governed the revision of rating board decisions, stated, in pertinent part:

> (D) *Except in case of fraud*, . . . when the breaking of service connection is contemplated under subparagraph (A), or before a rating breaking service connection is rendered under subparagraph (B), the claimant will be immediately notified in writing of the proposed action and given a reasonable period, not to exceed sixty days from the date on which notice is mailed to his last address of record, for the presentation of additional evidence in either writing or by hearing.

R. & P. R-1009(D) (Oct. 28, 1936) (emphasis added). Although R. & P. R-1009(D) underwent several revisions between 1936 and 1955, the text of the regulation clearly retained the intent to exclude cases of fraud from the procedural safeguards protecting claimants against the erroneous denial, reduction, or discontinuance of benefits. *See* R. & P. R-1009(D) (1937, 1942, 1945, 1947) ("This procedure is for application except (1) in case of fraud . . . ."); VA Regulation (VAR) 1009(D) (1951, 1954, 1955) ("This procedure is for application except (1) in case of fraud . . . .").

In 1959, VAR 1009 was renumbered as VAR 1105 (currently 38 C.F.R. § 3.105) and that regulation was amended to include an introductory paragraph that reads: "The provisions of this paragraph apply except where there is fraud; a change of law, a change in interpretation of law specifically stated in a VA issue; or evidence establishes that service connection was clearly illegal." VA Compensation and Pension (C&P) Transmittal Sheet 191 at 36. This amendment was announced as a "[r]estatement of VA Regulations 1009 and 2670." VA C&P Transmittal Sheet 191 at ii. In December 1962, the introductory language of § 3.105 was amended to state, in relevant part, that "[t]he provisions of this section apply except where an award was based on an act of commission or omission by the payee or with his knowledge ([38 C.F.R.] § 3.500(b))." Pensions, Bonuses, and Veterans Relief, 27 Fed. Reg. 11,886 (Dec. 1, 1962) (to be codified at 38 C.F.R. § 3.105).

The explanation accompanying these changes indicates that they were made necessary by Public Law 87-825, enacted in October 1962, which governs the effective dates of awards of VA benefits, and states that consistent with the provision of 38 U.S.C. § 3012(b) (currently 38 U.S.C. § 5112(b)), "the preamble to paragraph 1105 has been amended to eliminate reference to 'fraud' and to substitute acts of commission or omission by the payee." VA C&P Transmittal Sheet 267. The

legislative history accompanying Senate Report 87-2042, notes that House Bill 7600 was proposed to amend 38 U.S.C. § 3012, governing the effective dates of awards, reductions, and discontinuances of monetary benefits, and would thereafter provide, in relevant part, that the "effective date of a reduction or discontinuance of an erroneous award based upon an act of commission or omission by the beneficiary shall be effective the date of the erroneous award."  S. REP. NO. 87-2042, at (9) (1962), *reprinted in* 1962 U.S.C.C.A.N. at 3267.  It was specifically noted that "[t]his is a restatement of existing law as it relates to fraud and is broadened to include other acts or failure to act on the part of the claimant, not necessarily fraudulent in nature, which constitute misrepresentation or other furnishing of incorrect information or failure to furnish correct information, leading to the establishment or continuation of an award of payments which should not have been made." *Id.*

Also in 1962, upon the passage of House Bill 113, which gave rise to what is now 38 U.S.C. § 1159 (formerly 38 U.S.C. § 359), VAR 1105(D) was amended to state: "Subject to the limitations contained in VA Regulation 1957 [(currently 38 C.F.R. § 3.957)], service connection will be severed only where evidence establishes that it is clearly and unmistakably erroneous."  H. R. NO. 113 (1962).  The purpose of the revision was to "exclude determinations of service connection which have been in effect for 10 or more years, and which are protected from severance by Public Law 86-501."  VA C&P Transmittal Sheet 236.  When House Bill 113 was passed, a cross reference to VAR 1957, the regulation relating to the protection for service connection, was added to VAR 1105(D). *Id.*

c. Law Governing Effective Dates

Analysis of the law governing effective dates is consistent with the conclusion that § 3.105(d) does not apply to cases of fraud.  In 1962, Congress amended 38 U.S.C. § 3012 (now 38 U.S.C. § 5112) concerning "Effective dates of awards," to provide in subsection (b)(9) that, after determining that severance of an award of service connection has been made, the "effective date of a reduction or discontinuance of compensation, dependency and indemnity compensation, or pension . . . by reason of an erroneous award based on an act of commission or omission by the beneficiary, or with his knowledge, shall be effective the date of the award." Pub. L. No. 87-825 § 2, 76 Stat. 949 (1962).  The explanatory statement accompanying that act indicates that that revision was a

15

restatement of existing law as it relates to fraud and is broadened to include other acts or failure to act on the part of the claimant, not necessarily fraudulent in nature, which constitute misrepresentation or other furnishing of incorrect information or failure to correct information, leading to the establishment or continuation of an award of payments which have been made.

*Id.* The current version of the statute contains language identical to that in effect in 1962. *See* 38 U.S.C. § 5112(b)(9). Its implementing regulation, 38 C.F.R. § 3.500, originates from VAR 2586, which in 1943 provided, in relevant part, that "[w]here subsequent to the approval of an award, fraud is shown to have been committed . . . the effective date of discontinuance shall be as of the effective date of the award." VAR 2586(H) (1943); VA C&P Transmittal Sheet 191. Section 3.500 of title 38, Code of Federal Regulations, currently provides, in pertinent part, that the effective date of a reduction or discontinuance of compensation due to an erroneous award based on an act of commission or omission by the payee will be the "[e]ffective date of award or day preceding act, whichever is later." 38 C.F.R. § 3.500(b).

### 2. *Procedural safeguards in cases of fraud.*

The Secretary submits that § 3.103, rather than § 3.105(d), sets out the procedural processes that are applicable to severing fraudulently obtained awards of service connection. He asserts that § 3.105(d) provides the procedural due process for revocation proceedings and is therefore not at issue in this case. Section 3.103 of title 38, Code of Federal Regulations, provides every claimant "the right to written notice of the decision made on his or her claim, the right to a hearing, and the right of representation." 38 C.F.R. § 3.103(a). Section 3.103 further states that claimants and their representatives shall be given notice of any decision affecting the payment of benefits and requires such notice to "clearly set forth the decision made, any applicable effective date, the reason(s) for the decision, the right to a hearing on any issue involved in the claim, the right of representation and the right, as well as the necessary procedures and time limits, to initiate an appeal of the decision." 38 C.F.R. § 3.103(b). By its own terms, these procedures are applicable even in cases of fraud, as subsection (b)(2) of § 3.103 specifically states that "no award of compensation, pension or dependency or indemnity compensation shall be terminated, reduced or otherwise adversely affected unless the beneficiary has been notified of such adverse action and has been provided a period of 60 days in which to submit evidence for the purpose of showing that the adverse action should not be taken." 38 C.F.R. § 3.103(b)(2). Indeed, the § 3.103 procedures closely track the procedures set

forth in § 3.105(d) applicable to cases of severance in cases other than fraud, with procedures from both regulations satisfying general due process requirements. *See Grovhoug v. Brown*, 7 Vet.App. 209, 213 (1994) (setting forth provisions in title 38, Code of Federal Regulations, that require procedural due process, to include §§ 3.103 and 3.105); 38 C.F.R. § 3.103 (entitled "procedural due process and appellate rights").

The Secretary also notes that the procedures set out in the M21-1MR support his position. The M21-1MR includes fraud in its defined acts of commission and omission and provides that, upon a preliminary finding of fraud, the beneficiary or fiduciary should be notified of the proposed adjustment; the reason for the adjustment; his or her right to present evidence, within 60 days, to rebut the evidence serving as the basis for the proposed adjustment and to show why the adjustment should not be made; and his or her right to representation and a personal hearing. M21-1MR, pt. III, subpt. vi, ch. 5, sec. A (2007). The M21-1MR also provides that if no evidence is submitted within 65 days from the date that the notification letter was sent, the benefits award shall be amended, effective the beginning date of the award or the day preceding the date of the fraudulent act, whichever is later. *Id.* These procedures closely track the notification provisions of §§ 3.103 and 3.105(d) as well as the effective-date provisions of § 3.500(b).

### 3. Summary.

Accordingly, we conclude that the provisions of § 3.105 do not apply to cases involving severance of service connection based on fraud. Interpreted together, §§ 3.957, 3.105, and 3.500 establish that when fraud is found to have formed the basis for an award of service-connected benefits, regardless of the length of time a claimant has been in receipt of those benefits, severance of the award can be made upon a showing of fraud alone. To hold otherwise ignores the plain language of the regulation, its place in the greater regulatory scheme, and prior law. *See Gardner v. Derwinski*, 1 Vet.App. 584, 586 (1991) ("Determining a statute's plain meaning requires examining the specific language at issue and the overall structure of the statute."), *aff'd sub nom. Gardner v. Brown*, 5 F.3d 1456 (Fed.Cir.1993), *aff'd* 513 U.S. 115 (1994); *Johnson v. Brown*, 9 Vet.App. 369, 371 (1996) (When "'the plain meaning of a statute is discernible, that plain meaning must be given effect.'" (quoting *Tallman v. Brown*, 7 Vet.App. 453, 460 (1995))); *Smith v. Derwinski*, 2 Vet.App. 429, 431 (1992) (If a "reviewing court 'find[s] the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances.'" (quoting

*Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991))); *see also King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (holding that when interpreting a statute [or regulation], the court is required to look at the context and provisions of law as a whole); *Imazio Nursery, Inc. v. Dania Greenhouses*, 69 F.3d 1560, 1564 (Fed. Cir. 1995) (holding that all parts of a statute must be construed together without according undue importance to a single or isolated portion); *Smith v. Brown*, 35 F.3d 1516, 1523 (Fed. Cir. 1994) (noting that canons of statutory interpretation apply to interpreting regulations); *Ventigan v. Brown*, 9 Vet.App. 34 (1996) (stating that Board should have applied effective-date rules in section 5112(b) to sever an award of DIC benefits based on fraud rather than the CUE standard of § 3.105(d)); *Allen* and *Venturella*, both *supra*.

Although our dissenting colleagues suggest that our plain-language interpretation of § 3.105 runs contrary to the Secretary's "longstanding position," *post* at 22, the Secretary's submissions to the Court demonstrate that the Secretary has no long-standing position on this issue. Specifically, in a response to an August 5 order, the Secretary averred that "no written guidance existed regarding procedures, practices[,] or policies used for severing service connection of protected ratings due to fraud," either at the time of the August 2005 Board decision, or at any time thereafter. *See* Secretary's response to the Court's Order of August 5, 2009, at 1-2. Moreover, the Secretary also stated that a consistent position could not be discerned from its prior litigation positions, as the Secretary could uncover only two cases in which the Board addressed severance of service connection based on fraud. *Id.* at 4.

### D. Application of Law

#### 1. Notice.

By complying with the § 3.105(d) notice provisions, the RO also satisfied the § 3.103 and M21-1MR procedures and gave Mr. Roberts the appropriate opportunity to present evidence in opposition of severance. The only response received during the 60-day period from the date of notice of the proposed severance was Mr. Roberts' request that the Board refrain from severing his service connection until he could appeal. When no evidence in opposition to severance was received during the 60-day period, the RO permissibly severed service connection, effective August 1993. *See* 38 U.S.C. § 5112(b)(9); 38 C.F.R. § 3.500(b), (k). Although Mr. Roberts thereafter submitted evidence to suggest that his award of service connection for PTSD was proper based on additional stressors, he failed to submit evidence within the 60-day period and, as discussed above, the Board's

18

finding of fraud as the basis for severing service connection for PTSD was plausible upon review of the record as a whole. *See* 38 C.F.R. § 3.103; M21-1MR, pt. III, subpt. vi, ch. 5, sec. D (2007).[6]

### 2. *Application of 38 C.F.R. § 3.105(d) is nonprejudicial.*

Here, the Board needlessly applied the provisions of § 3.105(d); however, any error in the Board's application of this subsection is nonprejudicial. *See* 38 U.S.C. § 7261 (b) (2) (Court must take due account of the rule of prejudicial error); *Shinseki v. Sanders,* 129 S. Ct. 1696, 1706 (2009) (the rule of prejudicial error requires Federal courts to review cases for errors of law without regard to errors that do not affect the parties' substantial rights). The Board's finding that the award of benefits for PTSD was based on fraud supported, as a matter of law, both the severance of the award and the assignment of an effective date for the severance action as of the date of the award. *See* 38 U.S.C. §§ 1159, 5112(b)(2); 38 C.F.R. §§ 3.105(d), 3.957; *see also Allen, Venturella,* and *Ventigan*, all *supra*.

### E. Board Error in Adjudication of Other Claimed Disabilities

Although the Secretary is not required to process and adjudicate a claim for benefits in the same proceedings in which he processes and adjudicates an action to sever benefits based on a separate disability, he is not precluded from doing so. *See Tyrues v. Shinseki*, 23 Vet.App. 166, 179 (2009). In the decision on appeal, the Board also denied Mr. Roberts' claims for VA benefits for tobacco use, alcohol abuse, a digestive disorder, erectile dysfunction, an eye disorder, obesity, chronic fatigue syndrome, a personality disorder, a cardiovascular disorder, pulmonary disorder, arthritis of the right knee, and dysthymia and depression, all claimed as secondary to PTSD, because it found that Mr. Roberts was no longer service connected for PTSD. R. at 32-33, 38-40. Secondary service connection is awarded when a disability "is proximately due to or the result of a service-connected disease or injury." 38 C.F.R. § 3.310(a) (2009). Because Mr. Roberts' award of service

---

[6] Contrary to our dissenting colleagues' statement that we "today erect[] a *total bar* to benefits" for the appellant and "*any* veteran who commits an act of fraud in the pursuit of benefits," that is simply not true. To the extent the appellant believes that he, during the severance proceedings, submitted to VA evidence suggesting that service connection for PTSD is warranted based on stressors *other than* the stressor found to be fraudulent, the appellant may pursue any such pending claim for benefits with VA. *See DiCarlo v. Nicholson*, 20 Vet.App. 52, 56-57 (2006) (holding that, where a claim remains unadjudicated because the Secretary failed to process it, the appropriate resolution "is to pursue a resolution of the original claim, e.g., seek issuance of a final [regional office] decision with proper notification of appellate rights and initiate a [Notice of Disagreement]."). Here, the Board did not adjudicate a claim for service connection for PTSD based on stressors *other than* the stressor found to be fraudulent (e.g., the shore patrol incident) and was not required to do so as part of the severance proceeding.

19

connection for PTSD has been severed, the Board correctly determined that he could not be awarded secondary service connection for any condition that is secondary to PTSD.

However, in *Robinson v. Peake,* this Court held that the Board is required to consider all issues raised either by the claimant or by the evidence of record. 21 Vet.App. 545, 553 (2008). In reaching this conclusion, the Court specifically stated that "[t]he proposition that separate theories in support of a claim for benefits for a particular disability equate to separate claims for benefits for that disability is no longer the law." *Id.* at 551. In *Roebuck v. Nicholson,* the Court recognized that "although there may be multiple theories or means of establishing entitlement to a benefit for a disability, if the theories all pertain to the same benefit for the same disability, they constitute the same claim." 20 Vet.App. 307, 313 (2006). This statement of law does not amount to a requirement that the Board must "sua sponte . . . raise and reject 'all possible' theories of entitlement in order to render a valid opinion." *Robinson,* 21 Vet.App. at 553. Rather, the Board only commits error in failing to discuss a theory of entitlement that was raised either by the appellant or by the evidence of record. *Id.*

Here, Mr. Roberts raised, and the Secretary and Board adjudicated, a claim for benefits for dysthymia and depression, arguing that these conditions are directly related to service and were not secondary to his PTSD. Additionally, the September 1993 VA mental disorders examination report records a diagnosis of dysthymia. The Board denied compensation for dysthymia and depression because "the assignment of separate ratings under 38 C.F.R. § 4.25 assumes and requires the existence of a service[-]connected disability," which Mr. Roberts no longer had. R. at 33-34. Although this statement adequately explains why service connection for dysthymia and depression is not warranted on a secondary basis, it does not address Mr. Roberts' assertion that these conditions are directly connected to service.

Further, the Board indicated that it was without jurisdiction to consider Mr. Roberts' arguments regarding direct service connection for dysthymia and depression on a basis different from that presented to the RO. *See* R. at 33 (stating that Board "may address only those issues developed and adjudicated by the RO. It may not modify issues to conform to recent events, even if such change benefits the veteran"). However, the Board erred: "Once the Board has jurisdiction over a claim . . . it has the authority to address all issues related to that claim, even those not previously decided by the RO." *Jarrell v. Nicholson*, 20 Vet.App. 326 (2006) (en banc); *see also Buckley v.*

20

*West*, 12 Vet.App. 76, 82-83 (1998) ("Court has jurisdiction over claims that an appellant has reasonably raised to the RO and that the [Board] failed to properly adjudicate"); *see also Bernard v. Brown*, 4 Vet.App. 384 (1993) (Board's inquiry is not limited to specific questions decided by RO but includes all questions reasonably raised by the record that were necessary to its decision on that matter).

Accordingly, remand is warranted for the Board to address service connection on a direct basis for dysthymia and depression. *See Tucker v. West*, 11 Vet.App. 369, 374 (1998) (remand is appropriate "where the Board has incorrectly applied the law, failed to provide an adequate statement of reasons or bases for its determinations, or where the record is otherwise inadequate"); *Bernard, supra*. On remand, Mr. Roberts may present, and the Board must consider, any additional evidence and argument in support of the matters remanded. *See Kay v. Principi*, 16 Vet.App. 529, 534, (2002). These matters are to be provided expeditious treatment on remand. *See* 38 U.S.C. § 7112.

## IV. CONCLUSION

Upon consideration of the foregoing, that part of the August 26, 2005, Board decision denying Mr. Robert's claim for disability compensation for dysthymia and depression on a direct basis is SET ASIDE and the matters are REMANDED for further adjudication. The remainder of the decision is AFFIRMED. *See* 38 U.S.C. § 7252(a).

HAGEL, *Judge*, with whom SCHOELEN, *Judge*, joins, concurring in part and dissenting in part: I concur with the majority's decision in Part III.A, regarding the Board's finding of fraud; Part III.B, regarding the applicability of 31 U.S.C. §§ 3801-3812 and 38 C.F.R. § 42.1; and Part III.E, vacating and remanding Mr. Roberts' claim for benefits for dysthymia and depression on a direct basis. I must dissent, however, from the remainder of the majority's decision.

This case deals with the bedrock of veterans' entitlement to benefits: All veterans who have honorably served our country are entitled to fair process in the adjudication of their claims, regardless of their postservice activities. The majority allows its distaste for the postservice conduct of an honorably discharged veteran to cloud its view of his entitlement to the applicable evidentiary and procedural protections provided for by VA's regulations. The majority permits VA to deny this veteran proper process in the severance of benefits that he had been receiving for more than 10 years and gives VA a pass on its failure to assist the veteran in developing existing evidence of other

stressors that would support the continuance of service connection for post-traumatic stress disorder and the associated disability compensation.

A. Application of 38 C.F.R. § 3.105(d)

*1. Unexplained reversal of regulatory interpretation by VA.*

In a case that relies so heavily on regulatory interpretation, the majority opinion contains one glaring omission: The majority fails to adequately account for and dispel the Secretary's abrupt change in position on the applicability of § 3.105(d). The majority's contention that the Secretary had no longstanding position on this issue rests on a faulty premise–that in response to the Court's August 5, 2009, request for further information, "the Secretary averred that no written guidance existed regarding this situation, either at the time of the August 2005 Board decision, or at any time thereafter." *Ante* at 17. In fact, the Secretary advised the Court that the only written policies and procedures he could locate involved the severance of service connection generally, and that he could find no specific policies and procedures relating to severance of protected service connection due to fraud. Secretary's Response to Aug. 5, 2009, Order at 2-4. Rather than conclude, as the majority does, that lack of procedure pertaining to this specific subset of severance proceedings means that the Secretary has *no* policy regarding these proceedings, I conclude that no separate policies or procedures for severing service connection (whether protected or not) based upon fraud exist because VA has regularly applied the two-step process it applied in this case to *all* cases of severance; that is, VA first determines whether, based upon fraud, the removal of protection is warranted under § 3.957 and then, if so, VA applies the procedural and evidentiary requirements of § 3.105(d). *See* Secretary's Response to Aug. 5, 2009, Order at Exhibit L, M (Board decisions of 1998 and 2006 indicating that the two-step analysis is proper). Additionally, the Secretary states (and the majority agrees) that a consistent position on this issue could not be discerned from prior cases because the Board has only twice addressed severance of service connection resulting from fraud. This statement rings hollow: Not only does the Secretary overlook Mr. Roberts' case (not to mention *Ventigan v. Brown*, 9 Vet.App. 34 (1996), which concerned dependency and indemnity compensation), but the Secretary also fails to comprehend that where a particular course of action has been followed in *all* cases in which a matter was considered, that course of action with respect to that matter can be said to be consistent.

My view that the Secretary's position, that severance of benefits is entitled to the protection of the procedures of § 3.105(d) even in cases of fraud, is longstanding is bolstered by his position in *Ventigan*, a 1996 case upon which the majority places great reliance. That case involved the attempted severance, based on fraud, of dependency and indemnity compensation benefits; the Board applied § 3.105(d) to that determination, and the Secretary defended that position before the Court.[7] 9 Vet.App. at 36.

Moreover, throughout the adjudication of this matter, VA has complied or attempted to comply with § 3.105(d). *See* R. at 1328-35 (August 2004 rating decision proposing severance and "setting forth all material facts and reasons" for the proposed severance (§ 3.105(d)); R. at 1337-40 (August 2004 regional office letter advising Mr. Roberts of the 60-day timeframe for submitting additional evidence, that he had the right to request a hearing, and that he had the right to be represented); R. at 23-24 (August 2005 Board decision stating that the severance of Mr. Roberts' service connection was governed by § 3.105(d)). In addition, in the more than four years that Mr. Roberts' appeal has been before the Court, the Secretary has consistently argued that § 3.105(d) applied. The parties submitted multiple briefs and the Court conducted oral argument before a panel of three judges in October 2008, and at no time did the Secretary even suggest that the evidentiary and procedural protections for severing service connection contained in § 3.105(d) are inapplicable in cases of protected service connection where the basis for severance is fraud. Indeed, it was not until the second oral argument in July 2009 that the Secretary took the litigating position that the preamble of § 3.105 wholly exempted § 3.105(d) from application in the case of fraud, reversing his long-held position to the contrary. *See Roberts v. Shinseki*, No. 05-2425, 2009 U.S. Vet. App. Lexis 1170 (June 8, 2009, per curiam order); Secretary's Response to June, 8, 2009, Court Order.

It is well settled that agency positions adopted in response to litigation, or those adopted as a "'post hoc rationalization' advanced by an agency seeking to defend past agency action against attack" are not entitled to deference from the Court. *Auer v. Robbins*, 519 U.S. 452, 462 (1997) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988)); *Martin v. Occupational*

---

[7] It is true, as the majority states, that the Court in *Ventigan* held that the Board erred in applying 38 C.F.R. § 3.105 to find that severance of VA benefits was proper, and that the Board should have applied 38 U.S.C. § 5112(b)(9). However, I believe that case was wrongly decided and ought to be overturned by the Court today because I believe that § 3.105(d) unquestionably applies even in cases of fraud. Nevertheless, *Ventigan* is distinguishable from Mr. Roberts' appeal because, in *Ventigan*, the appellant's benefits were *not* protected under § 3.957 because they had not been in effect for 10 or more years.

*Safety & Health Review Comm'n*, 499 U.S. 144, 156 (1991) ("'[L]itigating positions' are not entitled to deference when they are merely appellate counsel's 'post hoc rationalizations' for agency action, advanced for the first time in the reviewing court."). It is telling that in its recitation of the parties' arguments, the majority dedicates but a footnote to note merely that "[t]he Secretary acknowledges that this position [that § 3.105(d) does not apply in this case] differs from his initial presentation to the Court." *Ante* at 8 n.2. The fact that the majority has failed to call the Secretary to account for abruptly reversing his four-year-long position in this litigation suggests to me that the majority's decision is based less on an impartial view of the matter before the Court and more on a desire to punish a veteran who committed fraud after discharge, regardless of VA's failure to afford the veteran VA's own prescribed evidentiary and procedural protections. Moreover, as explained below, the majority's position directly opposes the manner in which Congress has determined this situation should be handled.

### 2. Interpretation of 38 C.F.R. § 3.105 and effective dates.

*Debile fundamentum fallit opus*: Where there is a weak foundation, the work fails.

– Bouvier's Law Dictionary and Concise Encyclopedia, at 2131 (3d rev. 1914)

A large part of the majority's decision rests on an erroneous interpretation of what can best be described as the preamble to 38 C.F.R. § 3.105.[8] The majority insists that the preamble exempts *all* provisions of § 3.105 from application in the event of fraud, but that analysis proceeds from the incorrect presumption that the regulatory language is ambiguous. Where the plain language of the regulation is clear, however, such reliance is misplaced. *Meedel v. Shinseki*, 23 Vet.App. 277, 280 (2009) (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("We begin with the language of the [ ] Act itself.")); *Trope v. Nicholson*, 20 Vet.App. 317, 320 (2006) ("If the meaning of the regulation is clear from its language, then that is 'the end of the matter.'" (quoting *Brown v. Gardner*, 513 U.S.

---

[8] Based on this preamble, the majority also attempts to conflate cases in which service connection was "clearly illegal" with cases in which an award of service connection was based on an act of commission or omission (which includes fraud). *See ante* at 11; 38 C.F.R. § 3.105. The majority does so in order to rely on cases that are easily factually distinguishable from Mr. Roberts' case for the proposition that § 3.105(d) does not apply where service connection has been found to be based on fraud. *See id.* (citing *Allen*, 21 Vet.App. at 61-62; *Venturella v. Gober*, 10 Vet.App. 340, 342 (1997)). Because the illegality in those cases involved appellants who did not have the requisite service to be entitled to disability compensation, while Mr. Roberts does have the requisite service to receive such compensation, reliance by the majority on those cases is misplaced.

115, 120 (1994))); *see also Black & Decker Corp. v. Comm'r of Internal Revenue*, 986 F.2d 60, 65 (4th Cir. 1993) ("Regulations, like statutes, are interpreted according to the canons of construction.").

Here, the plain language of the preamble refers only to effective dates for severance or discontinuance of benefits:

> The provisions of this section apply except where an award was based on an act of commission or omission by the payee, or with his or her knowledge *(§ 3.500(b))*; there is a change in law or a Department of Veterans Affairs issue, or a change in interpretation of law or a Department of Veterans Affairs issue *(§ 3.114)*; or the evidence establishes that service connection was clearly illegal. The provisions *with respect to the date of discontinuance of benefits* are applicable to running awards. Where the award has been suspended, and it is determined that no additional payments are in order, *the award will be discontinued effective date of last payment*.

38 C.F.R. § 3.105 (2009) (emphasis added). The relevant portion of § 3.500, which generally governs reductions and discontinuances, provides:

> (b) Error; payee's or administrative (38 U.S.C. 5112(b), (9), (10)).
>
> > (1) Effective date of award or day preceding act, whichever is later, but not prior to the date entitlement ceased, on an erroneous award based on an act of commission or omission by a payee or with the payee's knowledge.

38 C.F.R. § 3.500(b)(1) (2009).[9] The relevant portion of § 3.114 provides:

> (b) Discontinuance of benefits. Where the reduction or discontinuance of an award is in order because of a change in law or a Department of Veterans Affairs issue, or because of a change in interpretation of a law or Department of Veterans Affairs issue, the payee will be notified at his or her latest address of record of the contemplated action and furnished detailed reasons therefor, and will be given 60 days for the presentation of additional evidence. If additional evidence is not received within that period, *the award will be reduced or discontinued effective the last day of the month in which the 60-day period expired*.

---

[9] Subsections (9) and (10) of 38 U.S.C. § 5112(b) provide:

(b) The effective date of a reduction or discontinuance of compensation, dependency and indemnity compensation, or pension–

. . . .

> (9) by reason of an erroneous award based on an act of commission or omission by the beneficiary, or with the beneficiary's knowledge, shall be the effective date of the award; and

> (10) by reason of an erroneous award based solely on administrative error or error in judgment shall be the date of last payment.

38 C.F.R. 3.114(b) (2009) (emphasis added). The citation of these two regulations, in addition to the effective-date provisions included in the final two sentences of the preamble, makes it clear that the preamble language acts to *substitute* the application of the effective-date provisions contained in § 3.105 with other effective-date provisions in certain enumerated circumstances. For example, where, as here, an award of benefits was based on an act of commission or omission, the effective-date provision for severance of service connection provided under § 3.105(d) is substituted with that of § 3.500(b). Thus, severance takes place as of the effective date of the award of benefits, rather than as of "the last day of the month in which a 60-day period from the date of notice to the beneficiary of the final rating action expires."[10] 38 C.F.R. § 3.105(d). Because the plain language of the regulation provides otherwise, there is no basis for the majority's view that § 3.105(d) does not apply in Mr. Roberts' case.

### 3. VA's affirmation of its longstanding interpretation of 38 C.F.R. § 3.105.

The majority takes great pains to recount the regulatory history of § 3.105, but wholly fails to take into account that the Secretary's clearest and most current published interpretation of this regulatory provision is contrary to his current litigating position and the majority's interpretation of § 3.105. In May 2007, the Secretary proposed, by publication in the Federal Register, "to reorganize and rewrite in plain language general provisions applicable to [VA's] compensation and pension regulations, including general evidence requirements, general effective dates for new awards, revision of decisions, and protection of existing ratings." 72 Fed. Reg. 28,770 (May 22, 2007).

In its revision, VA intends to *clarify* and recodify 38 C.F.R. § 3.957 and the provisions of 38 C.F.R. § 3.105(d) that govern when service connection may be severed at 38 C.F.R. § 5.175, entitled "Protection or severance of service connection."[11] That section provides:

(a) Protected service connection.

(1) VA may not sever service connection that has been in effect for 10 years or more unless evidence shows that:

---

[10] In such cases, the penalty for an act of commission or omission is clear: Because the effective date of severance will be the effective date of the award, the veteran will be required to repay VA all of the benefits he received. In typical severance cases, where there is no need to apply the substitute effective date provisions of the preamble of § 3.105, no repayment is required.

[11] I discuss the majority's erroneous interpretation of 38 C.F.R. § 3.957 below.

(i) The original grant was obtained through fraud, or;

(ii) It is clear from military records that the person identified as a veteran did not have the requisite qualifying military service or the veteran's discharge from service is of a type to prevent service connection as described in § 5.30.

. . . .

(b) Severance of service connection.

(1) VA will sever service connection when evidence establishes that it is clearly and unmistakably erroneous (the burden of proof being upon VA) subject to §§ 5.152 and 5.176.

(2) A change in diagnosis may be accepted as a basis for severance of service connection if the examining physician or physicians or other proper medical authority certifies that, in the light of all accumulated evidence, the diagnosis that was the basis of the award of service connection is clearly erroneous. This certification must be accompanied by a summary of the facts, findings, and reasons supporting the conclusion that the diagnosis is erroneous.

72 Fed. Reg. 28,792-93 (proposed May 22, 2007) (to be codified at 38 C.F.R. § 5.175).

The due process procedures for severing service connection will be recodified in their own section, § 5.176, which restates the procedural requirements of § 3.105(d) for severing service connection and § 3.105(e) for reducing or discontinuing compensation benefits. *See* 72 Fed. Reg. 28,783. That regulation states:

Except as provided in § 5.83(c),[12] when VA is contemplating severing service connection or reducing or discontinuing compensation benefit payments (including those based on individual unemployability), VA will:

(a) Prepare a rating proposing severance of service connection or reduction or discontinuance of compensation benefit payments and setting forth all material facts and reasons;

(b) Consistent with § 5.83, notify the beneficiary at his or her latest address of record of the contemplated action and furnish detailed reasons therefor; and

---

[12] Proposed § 5.83 is the proposed rewrite of 38 C.F.R. § 3.103, governing procedural due process and appellate rights. 70 Fed. Reg. 24,683 (May 10, 2005). Proposed § 5.83(c) is the rewrite of § 3.103(b)(3), which requires notice to the veteran contemporaneous with VA's adverse action in circumstances not applicable here. 70 Fed. Reg. 24,687-88.

(c) Allow the beneficiary 60 days from the date of the notice proposing severance, reduction, or discontinuance, to present additional evidence to show that service connection should be maintained, the rating should not be reduced, or the benefits should remain intact. If VA receives no additional evidence within the 60-day period, or the evidence received does not demonstrate that the proposed action should not be taken, VA will notify the beneficiary that VA is severing service connection or reducing or discontinuing the benefit.

72 Fed. Reg. 28,793 (proposed May 22, 2007) (to be codified at 38 C.F.R. § 5.176). I note that *nowhere* in proposed § 5.176 does VA exclude cases of severance of service connection based on fraud from the due process procedures contained therein.

Finally, VA proposes to extract the effective-date provisions from § 3.105(d) and (e) for severance of service connection and reduction or discontinuance of benefits. In its explanation of the changes, VA states:

> We propose in paragraph (a) to *restate* the provisions *found in the introductory paragraph of § 3.105 regarding effective dates* for reductions or discontinuances of suspended awards. We propose in paragraph (c) to list the three exceptions to § 5.177, *which are derived from the introductory paragraph of § 3.105 and current § 3.500(b)*. We propose not to include the exception for cases where the award of service connection was "clearly illegal" because such cases would properly fall within § 3.105 and proposed § 5.177(d). We propose in paragraphs (d) through (i), to state the specific type of benefit that is the subject of the particular effective date rule and to explain when the benefit will be reduced, stopped, or severed. These effective date provisions are from paragraphs (c) through (h) of the current version of § 3.105.

72 Fed. Reg. 28,783 (emphasis added).

> Section 5.177 provides, in relevant part:

> **Effective dates for severing service connection or discontinuing or reducing benefit payments.**
> . . . .
> (c) *Exceptions.* This section does not apply if:

> > (1) There is a change in law or a VA administrative issue or a change in interpretation of law or VA issue; if so, § 5.152 applies (effective dates based on change of law or VA issue);

> > (2) *An award was erroneous due to an act of commission or omission by the beneficiary or with the beneficiary's knowledge; if so, § 5.165(b) applies*; or

28

(3) An award was based solely on administrative error or an error in judgment by VA; if so, § 5.165(c) applies in cases other than severance of service connection under paragraph (d) of this section or reduction of compensation under paragraph (f) of this section.

(d) Severance of service connection. This paragraph (d) applies when VA severs service connection. In such cases, two 60-day periods apply. After applying the 60-day notice period described in § 5.176, VA will sever service connection effective the first day of the month after a second 60-day period beginning on the day of notice to the beneficiary of the final decision.

72 Fed. Reg. 28,793 (proposed May 22, 2007) (to be codified at 38 C.F.R. § 5.177) (emphasis in subsection (c)(2) added).

Section 5.165(b), which is a recodification of § 3.500(b) (*see* 72 Fed. Reg. 28,779),[13] in turn provides:

(b) *Effective date of reduction or discontinuance based on beneficiary error.* If an award was based on an act of commission or omission by the beneficiary or any act of omission or commission with the beneficiary's knowledge, VA will pay a reduced rate or discontinue benefits effective the latest of the following dates:

(1) The effective date of the award;

(2) The date preceding the act of commission or omission; or

(3) The date entitlement to the benefit ceased.

72 Fed. Reg. 28,790 (proposed May 22, 2007) (to be codified at 38 C.F.R. § 5.165).

The Secretary asserted at oral argument before the full Court in July 2009 and in filings immediately thereafter that these changes, particularly the change extracting the preamble language from § 3.105 and codifying it separately at § 5.176 (governing effective dates for reductions or discontinuances of awards based on error), constitute substantive changes in the Government's interpretation of this regulation. The explanatory text of the Secretary's proposed regulations betrays him, however. VA stated that

[a]lthough these regulations have been substantially restructured and rewritten for greater clarity and ease of use, most of the basic concepts contained in these proposed

---

[13] VA reports that proposed § 5.165 "applies only to reductions or discontinuances of erroneous awards." 72 Fed. Reg. 22,779.

regulations are the same as in their existing counterparts in 38 C.F.R. part 3. However, a few substantive differences are proposed . . . .

. . . .

Readers who . . . observe substantive changes between [existing regulatory provisions and proposed provisions] should consult the text that appears later in this document for an explanation of significant changes in each regulation.

72 Fed. Reg. 28,771-28,772. It is clear from this statement that, where VA intended substantive changes to a regulation, those changes are expressly explained in the text of the document.[14] There is no such explanation indicating that the rewriting and restructuring of the regulations at issue here are intended as substantive changes. The Secretary's proposed reorganization and rewrite of part 3 removes the preamble language from § 3.105 and separately codifies it in a section that governs effective dates, which only serves to support both the plain language reading of the preamble of § 3.105 that I outline above, as well as the Secretary's longstanding position on the applicability of § 3.105(d) . The Secretary's position is pointedly emphasized by his consistent interpretations of these regulations in this case between August 2005 and May 2009. Consequently, there can be no question that the majority has erred in its determination that § 3.105(d) does not apply to Mr. Roberts' appeal.

### B. Majority's Interpretation of 38 C.F.R. § 3.957

The majority holds that the Board need not have applied § 3.105(d), its finding regarding that regulation's applicability notwithstanding, because § 3.957 permits VA to sever service connection on the basis of fraud alone. I disagree. The relevant portion of § 3.957 is worth restating:

Service connection for any disability or death granted or continued under title 38 U.S.C., which has been in effect for 10 or more years will not be severed except upon a showing that the original grant was based on fraud or it is clearly shown from

---

[14] I also note that the Secretary has, in fact, expressly explained the substantive changes made in this portion of the proposed rewrite. *See* 72 Fed. Reg. 28,776 ("Except as provided below, no substantive changes are intended to these provisions"; "This is a substantive change based upon expanding current § 3.304(d)"; "This substantive change is consistent with current § 3.304(f)(2), pertaining to posttraumatic stress disorder claimed by a former prisoner of war."). It is true that the Secretary has also expressly stated in some cases that no substantive change has been made to a particular rule, but without fail, these circumstances are limited to rephrasing regulations or substituting one word for another. *See, e.g.*, 72 Fed. Reg. 28,773 ("Note that although current § 3.1(p) uses the terms 'claim' and 'application' interchangeably, we propose to only use the term 'claim' in part 5 . . . when referring to a formal or informal communication in writing requesting a determination of entitlement or evidencing a belief in entitlement to a benefit . . . . Thus, the term 'claim' would have the same meaning in Part 5 as it currently does in Part 3; no substantive change is intended."); 72 Fed. Reg. 28,774 ("We intend no substantive changes to this regulation by eliminating the term 'informal claim.' The term 'claim' necessarily embraces all of the types of claims listed in the regulations, including informal and formal claims."); 72 Fed. Reg. 28,775 ("Although we have changed the language taken from these two sources in order to make the proposed rule easier to understand, we intend no change in the substance they convey.").

30

military records that the person concerned did not have the requisite service or character of discharge. The 10-year period will be computed from the effective date of the Department of Veterans Affairs finding of service connection to the effective date of the rating decision severing service connection, after compliance with § 3.105(d).

The majority takes the position that § 3.957 requires "compliance with § 3.105(d) . . . only with regard to computing the 10-year period for determining whether an award is protected from severance." *Ante* at 12. The majority ignores, however, that the plain language of the regulation indicates that the 10-year period cannot be calculated until *after* the severance proceedings are completed–otherwise the "effective date of the rating decision severing service connection" cannot be determined–which requires compliance with the procedures of § 3.105(d). Moreover, the majority asserts, in essence, that the two sentences of § 3.957 are unrelated, in that, despite specific citation thereto, compliance with § 3.105(d) is not required where it is shown that the original grant of benefits was based on fraud. That view is simply incorrect and unsupported by common sense, the regulation's plain language, and the Secretary's consistent interpretation of the regulation.

The regulation provides that service connection in effect for more than 10 years "*will not be severed*" except, as relevant here, where the original grant is shown to have been based on fraud. 38 C.F.R. § 3.957 (emphasis added). It does *not* say that where the original grant of service connection is shown to have been based on fraud, service connection *will be severed*. Thus, the language of the regulation suggests that a finding of fraud is only a first step in the process of severing service connection; it is, essentially, a threshold matter that removes the protection otherwise afforded to service connection that has been in effect for more than 10 years. In other words, the second sentence of § 3.957 simply explains that the 10-year period cannot be calculated absent a rating decision severing service connection, and states that the rating decision severing service connection must be the result of compliance with § 3.105(d). Indeed, not even the Secretary disputes this interpretation. *See* Secretary's Response to June, 8, 2009, Court order at 1, 6. Further, this interpretation is supported by VA's *Adjudication Procedure Manual* (M21-1MR). *See* M21-1MR, pt. III, subpt. iv, ch. 8, sec. c ("Under 38 C.F.R. [§] 3.957, if service connection for disability or cause of death has been in effect ten or more years, *propose severance* only if the original grant was based on fraud . . . ." (emphasis added)); *see also* Secretary's Response to Aug. 5, 2009, order, Exhibit G. Because VA interprets § 3.957 to mean that severance of otherwise protected service

31

connection may only be proposed, not effectuated, upon a showing of fraud, and because that interpretation is reasonable and consistent with the regulation, the majority ought not supplant the Secretary's interpretation with its own. *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 202 (2001) (holding that an agency's longstanding interpretation of its own regulations is entitled to "substantial judicial deference"); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) (holding that an agency's interpretation of its own regulations is controlling unless that interpretation "is plainly erroneous or inconsistent with the regulation").

Because the majority holds that a finding of fraud alone is sufficient to allow VA to sever service connection under § 3.957, and because the majority ultimately concludes that the important evidentiary and procedural protections of § 3.105(d) are not applicable to cases of severance of service connection based on fraud, it never reaches the question of the proper interpretation of § 3.105(d). Because I believe the majority's conclusion in both regards is incorrect, I will review the Board's decision in light of what I believe is the proper application of § 3.105(d).

### C. The Board's Application of 38 C.F.R. § 3.105(d)

The Board first noted that § 3.105(d) was the proper regulation under which to analyze this matter and then stated that the "same [clear and unmistakable error] standard which applies to a veteran's [clear and unmistakable error] challenge to a prior adverse determination under [§] 3.105(a) is also applicable in the Government's severance determination under [§] 3.105(d)." R. at 23-24 (citations omitted). The Board then outlined the requirements for finding clear and unmistakable error in a prior decision. R. at 24 (citing *Damrel v. Brown*, 6 Vet.App. 242 (1994) and *Russell v. Principi*, 3 Vet.App. 310 (1992) (en banc)). The Board acknowledged, however, that unlike § 3.105(a), § 3.105(d) does not limit, in determining the propriety of severance, the evidence that may be considered to the evidence that was before the regional office at the time of the initial decision, but instead requires the consideration of all the accumulated evidence. R. at 24. The Board then stated that, "under either basis for finding [clear and unmistakable error]," the May 1998 regional office decision granting service connection for post-traumatic stress disorder was based on clear and unmistakable error and therefore severance of Mr. Roberts' benefits was proper. *Id.*

The Board, purporting to apply § 3.105(d), found that severance was proper in Mr. Roberts' case for three alternative reasons, and I will address each in turn.

*1. Correct facts not before the adjudicator.*

The Board determined that the May 1998 grant of service connection contained clear and unmistakable error because the correct facts, as they were known at the time, were not before the regional office because of Mr. Roberts' fraudulent statements regarding his claimed stressor. Despite the Board's acknowledgment that § 3.105(d) requires consideration of all the accumulated evidence of record, the Board essentially applied the standard of § 3.105(a), *Damrel*, and *Russell*, and limited its discussion of clear and unmistakable error to the facts and evidence before the regional office at the time of its May 1998 decision. This was error.[15] *See Stallworth v. Nicholson*, 20 Vet.App. 482, 488 (2006) ("Severance of service connection based on any standard less than that established by § 3.105(d) is erroneous as a matter of law."); *Venturella*, 10 Vet.App. at 343.

To put this very technical discussion into its proper context, what must be proven by VA at this stage of the adjudication is that the *continuation* of Mr. Roberts' service connection would be clearly and unmistakably erroneous. 38 C.F.R. § 3.105(d) ("[S]ervice connection will be severed only where evidence establishes that it *is* clearly and unmistakably erroneous (the burden of proof being upon the Government)." (emphasis added)). Without a discussion by the Board of all of the accumulated evidence, including that which postdates the May 1998 regional office decision, the Board's determination that service connection is clearly and unmistakably erroneous is not in accordance with the law, and therefore its conclusion that severance of service connection is proper cannot stand. 38 U.S.C. § 7261(a)(3)(A); *Stallworth*, 20 Vet.App. at 489; *Eddy v. Brown*, 9 Vet.App. 52, 57 (1996) (holding that the Court's review of a Board finding of clear and unmistakable error is limited to determining whether the Board's conclusion was arbitrary,

---

[15] Even assuming that a finding of clear and unmistakable error in the initial decision granting service connection is a necessary component of a decision severing service connection under § 3.105(d), the Board's finding of clear and unmistakable error is not in accordance with the law. 38 U.S.C. § 7261(a)(3)(A). The first prong of the analysis under § 3.105(a) provides that clear and unmistakable error may exist in a prior decision where, among other conditions, "the correct facts, as they were known at the time, were not before the adjudicator." *Damrel*, 6 Vet.App. at 245. The Board stated that, because of Mr. Roberts' fraudulent statements, the correct facts were not before the regional office in May 1998. R. at 26. However, the correct facts were certainly *available* to the regional office at the time of the May 1998 decision, had VA chosen to obtain the 1969 Navy investigation report to attempt to corroborate Mr. Roberts' claimed stressor. Instead, it was VA that accepted only Mr. Holland's death certificate as adequate corroboration of the claimed stressor. To find clear and unmistakable error in the prior decision based on VA's failure to obtain records to dispute Mr. Roberts' version of events would be analogous to finding clear and unmistakable error in a prior decision based on VA's failure to obtain records to satisfy its duty to assist, which is not permitted. *See Cook v. Principi*, 318 F.3d 1334, 1344 (Fed. Cir. 2002); *Caffrey v. Brown*, 6 Vet.App. 377, 384 (1994).

33

capricious, an abuse of discretion, or otherwise not in accordance with law and whether it was supported by an adequate statement of reasons or bases).

### a. VA's Knowledge of the Existence of Alternative Stressors

In this case, the accumulated evidence of record includes, clearly and specifically, an alternative stressor–an incident in which Mr. Roberts claimed he was assaulted by the shore patrol, placed in a straight jacket, injected with Thorazine, and placed in bed restraints overnight in a psychiatric facility. Although the Board acknowledged that there was evidence of this alternative stressor, the Board stated that it did not need to consider the possibility of an alternative stressor because Mr. Roberts identified no additional stressors in his initial claim for benefits, and because the May 1998 regional office decision that granted benefits for post-traumatic stress disorder was based only on the Gary Holland stressor, which was later found to be fraudulent. R. at 28.

Neither rationale is sufficient to allow the Board to ignore the clearly asserted alternative stressor. First, notwithstanding the Secretary's assertion at oral argument and the Board's insistence that Mr. Roberts raised other possible stressors only *after* VA proposed to sever his benefits, Mr. Roberts has, in fact, alleged at least one additional or alternative stressor consistently since his initial application for VA benefits in August 1993.[16] *See* R. at 270-73 (August 2003 initial application for benefits that indicates that his condition began December 13, 1969, the date of the shore patrol incident), 409 (February 2002 letter from Mr. Roberts to Milwaukee, Wisconsin, regional office stating that his "symptoms" of post-traumatic stress disorder included his "hospitalization and restraint in a straight jacket and injected with Thorazine"), 906 (March 2003 private psychology consult that identifies the Gary Holland stressor as well as "at least 2 near tragedies" in service related to airplanes that Mr. Roberts was on that he believed were going to crash), 939 (April 2004 letter from Mr. Roberts to VA in which he asserts both the Gary Holland incident and the shore

---

[16] The majority also contends that Mr. Roberts' failure to submit evidence within the 60-day period following notice of the proposed severance decision precludes him from now arguing that service connection was erroneously severed. *See ante* at 17. In this regard, the majority curiously ignores the fact that VA had evidence of the stressor involving the shore patrol at least as early as 1991. *See, e.g.*, R. at 159 (March 1991 VA examination at which Mr. Roberts reported the shore patrol incident to the examiner); R. at 409 (February 2002 statement from Mr. Roberts requesting an earlier effective date for compensation benefits related to post-traumatic stress disorder); R. at 939 (April 2003 correspondence from Mr. Roberts to the regional office discussing the shore patrol incident as a documented in-service stressor); R. at 1197 (September 2003 hearing at which Mr. Roberts testified regarding the stressor involving the shore patrol incident). Because the record already contained evidence regarding the alternate stressor, there was no need for Mr. Roberts to submit additional evidence to VA regarding this matter within the 60-day period.

34

patrol incidents as stressors causing his post-traumatic stress disorder), 1185-89 (September 2003 regional office hearing at which Mr. Roberts asserted that the December 1969 shore patrol incident contributed to his post-traumatic stress disorder diagnosis). Second, the Board's assertion that, because the May 1998 regional office decision was based on a single stressor, it need not consider any alternative stressors, falters against the requirement of § 3.105(d) that the accumulated evidence of record be evaluated to determine whether service connection "is"–that is, presently–clearly erroneous. The Board applied the standard of § 3.105(a), but, as discussed at length above, this was improper and prevented the Board from adequately considering all of the accumulated evidence of record.

### b. Requirement that VA Develop All Claimed Stressors
### for Post-Traumatic Stress Disorder

In my view, because § 3.105(d) requires evaluation of all of the accumulated evidence, it follows that the Secretary must develop, if needed, facts regarding any feasible alternative bases for continuing the award of service connection that are reasonably raised by the record, and certainly when specifically identified by the claimant, prior to severing service connection. *See Robinson v. Shinseki*, 557 F.3d 1355, 1362 ("[W]here the claimant has raised an issue of service connection, the evidence in the record must be reviewed to determine the scope of that claim."). Despite having notice of additional alleged stressors, particularly of the shore patrol incident, at the outset of the adjudication, VA did not develop the facts surrounding those stressors, content instead to rest its decision to award disability benefits on a single stressor later found to be fraudulent.

Because VA determined in May 1998 that *one* of the stressors claimed by Mr. Roberts had been adequately corroborated to support a finding of service connection for post-traumatic stress disorder, VA was not obligated at that time to develop evidence pertaining to the other claimed stressors. However, I believe that–certainly before VA may sever service connection in a case such as Mr. Roberts'–where VA is aware of other stressors that could serve as a basis for continuing the award of post-traumatic stress disorder, VA must consider the validity of the other potential stressors. After such review, if VA determines that the accumulated evidence regarding another potential stressor is not adequately developed, it should take appropriate steps to further develop that evidence. In this case, such development would have included seeking evidence to corroborate or dispel the existence of an alternative claimed stressor and, if corroborated, obtaining a medical

35

opinion to determine whether the alternative stressor is sufficient to warrant a diagnosis of post-traumatic stress disorder.

### c. Importance of Diagnoses of Post-Traumatic Stress Disorder

I further note that, at the time of VA's August 2004 proposal to sever service connection, the record contained evidence showing that Mr. Roberts had received multiple diagnoses of post-traumatic stress disorder. There is absolutely no medical evidence in the record demonstrating that Mr. Roberts is not, in fact, severely mentally ill. *See* R. at 394-97 (April 1999 VA mental disorders examination); 449 (October 2002 letter from VA outpatient clinic psychiatrist stating that Mr. Roberts' post-traumatic stress disorder was caused by "the traumatic event [he was] exposed to in Italy"); R. at 904-07 (March 2003 private opinion by Donald Derozier, Ph.D., who reviewed "selected records" provided by Mr. Roberts, personally interviewed Mr. Roberts, and concluded "to a reasonable degree of psychological probability that the extant diagnostic coding systems at the time of the death of [Mr. Holland] under traumatic circumstances, subsequent maladjustment and psychological symptom appearances . . . could reasonably have made a post-traumatic stress disorder diagnosis," and that such post-traumatic stress disorder "probably occurred prior to 1980"); R. at 947-49 (April 2003 report from Dr. Derozier, who acknowledged the December 1969 shore patrol incident; stated, referring to a July 1992 VA communication, that the shore patrol event "was not mentioned in the context of [post-traumatic stress disorder], and therefore perceived as not relevant;" opined that "subsequent psychological problems were possibly related to the traumatic loss of [Mr. Roberts'] friend and subsequent associated events;" and concluded "to a reasonable degree of psychological probability that Mr. Roberts experienced a psychiatric condition that could have been or might have been diagnosed as [post-traumatic stress disorder] had such diagnos[i]s been extant and customary while he was in active duty"). Indeed, even a November 2004 VA medical opinion affirmatively stated that Mr. Roberts was not thought to be faking his symptoms. Additionally, by the time the Board rendered its August 2005 decision, a May 2005 private medical opinion diagnosing Mr. Roberts with post-traumatic stress disorder was also of record. While all of the diagnoses rendered rely at least in part on the Gary Holland stressor, none of them–save the November 2004 VA medical opinion, which I find inadequate for reasons that will be discussed below–indicates that, absent that single stressor, Mr. Roberts would not meet the DSM-IV criteria for post-traumatic stress disorder.

Terminating a veteran's long-held monthly disability compensation is a serious matter having profound consequences. Recognizing this, VA promulgated § 3.105(d), which permits severance only when service connection *is* clearly and unmistakably erroneous, and states that VA bears the "high burden of proof" of showing that this is so. *Graves v. Brown*, 6 Vet.App. 166, 170 (1994). VA had notice of other stressors that might support a diagnosis of post-traumatic stress disorder and of the fact that Mr. Roberts had been found–multiple times–to be mentally ill. In my opinion, VA accordingly had a duty, before it imposed the most serious sanction available, to consider the stressors identified in the record and, if necessary after proper consideration, to develop evidence so that it could determine whether Mr. Roberts was still entitled to disability benefits for post-traumatic stress disorder based on any other stressors. This obligation exists independently of, and despite, Mr. Roberts' false statements regarding his involvement in the attempted rescue of Mr. Holland. In the absence of such consideration and possible evidentiary development, I cannot conclude that VA has met its heavy burden of showing that service connection "*is* clearly and unmistakably erroneous." 38 C.F.R. § 3.105(d) (emphasis added).

### 2. Statutory or regulatory provisions incorrectly applied.

The Board also determined that the May 1998 regional office decision granting service connection contained clear and unmistakable error because the regional office incorrectly applied 38 C.F.R. § 3.304(f) when it accepted as corroboration of Mr. Roberts' claimed stressor the death certificate of Mr. Holland. Here, too, the Board appeared to apply the standard of § 3.105(a) rather than § 3.105(d) and focused solely on the "record and law that existed at the time of" the May 1998. R. at 24. Even if the standard of § 3.105(a) were applicable, however, the error identified by the Board does not constitute clear and unmistakable error under this standard. As discussed in footnote 9, under § 3.105(a), the failure to develop evidence is not the type of error that can rise to the level of clear and unmistakable error in a prior decision. *Cook*, 318 F.3d at 1344; *Caffrey*, 6 Vet.App. at 384 ("VA's breach of the duty to assist cannot form a basis for a claim of [clear and unmistakable error] because such a breach creates only an incomplete rather than an incorrect record."). Therefore,

for the reasons given in Part C.1 *supra*, I would conclude that the Board's finding of clear and unmistakable error on this issue is also not in accordance with the law.[17] 38 U.S.C. § 7261(a)(3)(A).

### 3. Change in diagnosis.

Finally, the Board determined, based on the November 2004 VA medical opinion provided by Dr. Berger, that Mr. Roberts no longer had a confirmed diagnosis of post-traumatic stress disorder and that the diagnosis on which service connection was based was therefore clearly erroneous. The relevant part of § 3.105(d) provides:

> A change in diagnosis may be accepted as a basis for severance action if the examining physician or physicians or other proper medical authority certifies that, in the light of all accumulated evidence, the diagnosis on which service connection was predicated is clearly erroneous. This certification must be accompanied by a summary of the facts, findings, and reasons supporting the conclusion.

38 C.F.R. § 3.105(d).

### a. Examination Inquiry

I begin my discussion of the adequacy of the medical opinion in this case by considering the contents of the October 2004 "Compensation and Pension Exam Inquiry" provided to the opining psychiatrist by VA. *See* R. at 1365-75. "[B]asic fair play requires that evidence be procured by the agency in an impartial, unbiased, and neutral manner," and this requirement applies to the solicitation of medical opinions. *Austin v. Brown*, 6 Vet.App. 547, 552 (1994); *see also Bielby v. Brown*, 7 Vet.App. 260, 268 (1994) (finding improper the Board's reliance on an independent medical opinion where the Board constrained the scope of inquiry in the engagement letter, thereby "limiting [the examiner's] investigation and tainting the results"). I believe that the VA inquiry that resulted in the November 2004 VA medical opinion by Dr. Berger does not meet this standard.

In its inquiry, VA stated that the claims file would be forwarded to the opining psychiatrist and requested that the psychiatrist allow sufficient time to review the five-volume file. VA,

---

[17] Again, even assuming that a finding of clear and unmistakable error in the initial decision is a necessary component of a decision severing service connection, the Board's decision is not in accordance with the law. 38 U.S.C. § 7261(a)(3)(A). The May 1998 regional office accepted Mr. Holland's death certificate as corroboration of Mr. Roberts' claimed stressor. The Board's finding that the death certificate is not *sufficient* to corroborate the claimed stressor under § 3.304(f) amounts to a reweighing of the evidence available to the regional office at the time of its decision. As the Board expressly acknowledged in its recitation of the clear and unmistakable error standard under § 3.105(a), disagreement about the weight assigned to the evidence in the prior decision does not rise to the level of clear and unmistakable error. *Russell*, 3 Vet.App. at 313-14.

however, also stated that "pertinent evidence" in the file had been tabbed and that "[m]uch of the other documentation [in the file] consists of duplicate copies of the claims folder submitted by the veteran, copies of VA Court decisions, and copies of medical text and information obtained over the internet." R. at 1365-66. It is evident from these statements that VA attempted to limit the opining psychiatrist's review of the claims file to the evidence VA deemed "pertinent" by denigrating the value of the remaining documents in the claims file. This type of limiting statement is never appropriate, and certainly not in a case where severance of service connection may rest on a change in diagnosis, because § 3.105(d) expressly requires that a medical professional who certifies a change in diagnosis make such a determination "in light of all accumulated evidence." 38 C.F.R. § 3.105(d); *Andino v. Nicholson*, 498 F.3d 1370, 1372 (Fed. Cir. 2007) ("The plain language of the regulation provides that service connection can only be terminated when a medical professional certifies that her *review of all the evidence* indicates that the prior diagnosis is 'clearly erroneous.'" (quoting § 3.105(d))); *see also Colayong v. West*, 12 Vet.App. 524, 535 (1999) (finding improper the Board's reliance on a medical opinion obtained through an engagement letter that "gave the examiner discretion as to whether to review certain prior medical records").

VA also informed the opining psychiatrist of the proposed severance of Mr. Roberts' benefits for post-traumatic stress disorder and listed several findings of fact, including that "[t]he diagnosis of [post-traumatic stress disorder] is not acceptable for VA rating purposes as it is based on a stressor determined to be fraudulent," that "[t]he evidence in its entirety contains many discrepancies in testimony by the veteran," and that "the medical opinions of record are based in part on fraudulent testimony and/or unreliable history provided by the veteran." R. at 1366-67. Taken together, these statements telegraph the conclusion apparently sought by VA: A diagnosis of post-traumatic stress disorder is not warranted because the stressor on which the diagnosis was initially based was fraudulent, and, thus, there should be no further finding of post-traumatic stress disorder. Further, the vague nature of the second and third quoted statements impermissibly taints *all* of Mr. Roberts' statements regarding his condition, including those regarding any nonfraudulent stressors he might have asserted throughout his claim.

Additionally, VA listed only the accident and failed rescue attempt of Mr. Holland as Mr. Roberts' reported in-service stressor and stated that "[t]he first report of the in[-]service trauma is documented in the [March 1991] VA[] Mental Health exam[ination]." *Id.* Although a summary of

39

Mr. Roberts' medical history provided to the psychiatrist included reference to the December 13, 1969, shore patrol incident and his subsequent hospitalization, it did not include that incident in its summary of the March 1991 mental health examination. VA's instructions to the examiner repeatedly ignored the shore patrol incident as a possible stressor, instead focusing the opining psychiatrist's attention solely on the Gary Holland incident. The examination inquiry also contained a statement that, after VA proposed to sever service connection, Mr. Roberts contacted VA "with questions regarding other stressors that might support a diagnosis of [post-traumatic stress disorder]."[18] R. at 1368, 1374. As noted above, however, Mr. Roberts repeatedly raised other potential stressors prior to November 2004, at least one of which was supported by service medical record entries. Because VA indicated in its inquiry that there was only one possible stressor to support a diagnosis of post-traumatic stress disorder and implied that Mr. Roberts had suggested additional stressors only after VA proposed to sever service connection–as if to indicate that consideration of other stressors would be improper–Mr. Roberts was deprived of the possibility of obtaining an impartial opinion that took into account *all* of his claimed stressors.

Finally, the information provided to the opining psychiatrist also included a detailed summary of the 2004 VA Inspector General's report, much of which was irrelevant to the needs of the reviewing psychiatrist. R. at 1374-75. I can discern no purpose for VA to include such an inflammatory summary beyond attempting to skew the resulting opinion in favor of a finding that a diagnosis of post-traumatic stress disorder was not warranted. This is particularly so in light of the fact that VA had already stated that the Gary Holland stressor had been found to be fraudulent and that the record was replete with inaccurate statements from Mr. Roberts.

For all of these reasons, I would conclude that the October 2004 VA inquiry does not comport with "fair process." *See Austin*, 6 Vet.App. at 551-52. Therefore, I would also conclude that the Board's determination that severance of service connection was proper based on a change

---

[18] I note again that VA has consistently argued, and the majority reasserts, that Mr. Roberts did not submit additional evidence during the 60-day timeframe allotted. I question this assertion in light of VA's statement to the opining psychiatrist on October 5, 2004 (less than 60 days after the August 18, 2004, notice of proposed severance), that Mr. Roberts had contacted VA with "questions" about additional stressors. I do not presume to know the precise nature and content of the contact between Mr. Roberts and VA that prompted this statement, but it appears that VA was at least on notice of the possibility of additional stressors that might support the continuation of service connection for post-traumatic stress disorder and may have violated its duty to assist in the development of evidence regarding those stressors.

in diagnosis likewise does not comport with fair process, because it is based on an opinion obtained by a process that did not ensure an impartial opinion. *Id.* at 552. Accordingly, I would hold that the Board's determination that severance of service connection for post-traumatic stress disorder was proper is not in accordance with the law. 38 U.S.C. § 7261(a)(3)(A).

b. November 2004 VA Medical Opinion

Assuming the "Compensation and Pension Exam Inquiry" was proper, however, would not change my view on this issue, because I also believe that Dr. Berger's opinion is inadequate to satisfy the high standards imposed by § 3.105(d). As noted above, § 3.105(d) permits severance of service connection based on a change in diagnosis where "the examining physician or physicians or other proper medical authority certifies that, in the light of all accumulated evidence, the diagnosis on which service connection was predicated is clearly erroneous." 38 C.F.R. § 3.105(d). The regulation further requires that such certification be accompanied by a summary of the facts, findings, and reasons supporting the examining physician's conclusions. *Id.*

In November 2004, Dr. Berger responded to VA's inquiry in a four-page opinion. R. at 1500-03. He discussed Mr. Roberts' preservice medical history and then stated:

> The primary traumas reported by the veteran, which are clearly documented in the claims file . . . , include an incident where he witnessed a supposed friend of his being killed; the next incident was when he was on a line crew flight and there was . . . a hard landing; however, there were no injuries. In another incident, there was a nose wheel problem when he was on a flight and, again, the plane almost crashed, but there was no injury to anyone involved. The final trauma he reported experiencing . . . was being forced to watch a video in which there was an explosion on a U.S. naval ship . . . . Having to watch this video was reportedly traumatic for the veteran. In reviewing these traumas with the note that the [I]nspector [G]eneral's office had investigated the incident which had originally caused service connection for the veteran, it is quite clear that the veteran had not experienced trauma which would be sufficient to cause post-traumatic stress disorder. It is quite clear that the basis for his post-traumatic stress disorder was based upon his alleged observation of the death of his supposed "friend." Additionally there was no documented evidence of the other reported traumas.
>
> As was shown by the [Inspector General's] report, since the veteran was not present during this incident, there does not appear to be any basis for his claim of post-traumatic stress disorder. It is, however, noted that his initial compensation and pension[] [examination] had shown that he was experiencing dysthymia and mixed personality disorder with antisocial and borderline traits. This was noted on a couple of subsequent exams after March of 1991. It was not until 1998 that a diagnosis of

41

[post-traumatic stress disorder] was determined based upon him witnessing the death of his supposed "friend."

The issue of malingering was considered, as it appears his claim of a trauma was not substantiated. Malingering was not felt to be an appropriate diagnosis in this case, as the veteran has reported and was assess[ed] as having actual ongoing mental health symptoms such as depress[ion], anxious mood, angry outbursts, violence toward family . . . and additional symptoms related to a mixed personality disorder with antisocial and borderline traits and dysthymia. Therefore, it does not appear that he is attempting to fake his symptoms but to use them to attain disability. However, his report of trauma does appear to be fraudulent, according to the [Inspector General], and therefore his symptoms would not be consistent to a diagnosis for [post-traumatic stress disorder]. His symptoms would rather be consistent to his original diagnosis in his first claims file compensation and pension exam in March 1991 . . . . At that time he had been diagnosed [with] dysthymia [and] mixed personality disorder with antisocial and borderline traits.

The progression of his pre-existing (conduct disorder) does not appear to have been aggravated by the military. . . . It is . . . my opinion that his current symptoms and diagnosis are part of a natural progression of his pre-existing illness and may have been aggravated by a non-service[-]related incident (myocardial infarction) or other situational incident (loss of job).

R. at 1501-02. In rendering its decision that severance of service connection was proper due to a change in diagnosis, the Board relied exclusively on Dr. Berger's opinion to find that the strict requirements of § 3.105(d) had been met. R. at 27. I cannot agree.

Although Dr. Berger did discuss four "primary traumas" or stressors, these incidents appear to have been culled solely from a March 2003 private medical report. *See* R. at 906. There is no discussion in Dr. Berger's opinion of the shore patrol incident, despite multiple references to that event in the record–including in other medical reports–as a possible stressor and despite VA's mentioning that event twice in its inquiry. Dr. Berger acknowledged that Mr. Roberts had been assessed as having "actual ongoing mental health symptoms," but did not acknowledge Mr. Roberts' multiple previous diagnoses of post-traumatic stress disorder and did not attempt to reconcile those diagnoses with his finding that a diagnosis of post-traumatic stress disorder was not warranted. I therefore cannot conclude that Dr. Berger considered "all accumulated evidence" as required by § 3.105(d). *See Andino*, 498 F.3d at 1372.

Moreover, Dr. Berger's conclusion that Mr. Roberts' symptoms were not consistent with post-traumatic stress disorder solely because the VA Inspector General's report found the Gary Holland

stressor to be fraudulent is not based on sound reasoning because he failed to discuss the evidence pertaining to the shore patrol incident. *See Nieves-Rodriguez v. Peake*, 22 Vet.App. 295, 304 (2008) ("It is the factually accurate, fully articulated, sound reasoning for the conclusion . . . that contributes probative value to a medical opinion."). Given the evidence of alternative stressors, it is not sufficient for Dr. Berger to simply opine that because a particular stressor is no longer part of the diagnostic equation, symptoms that had heretofore been diagnosed as post-traumatic stress disorder must no longer be consistent with that condition. Such a conclusion hardly allows an adjudicator "to conclude that a medical expert has applied thorough medical analysis to the significant facts of the particular case." *Id.* Dr. Berger expressly found that Mr. Roberts was not faking his symptoms, but did not consider other possible causes of post-traumatic stress disorder that might account for such symptoms, despite Mr. Roberts' repeated references in the record to an alternate stressor.

In light of this discussion, I would conclude that the Board's determination that the November 2004 VA medical opinion satisfied the requirements of § 3.105(d) is clearly erroneous. *D'Aries v. Peake*, 22 Vet.App. 97, 104 (2008); *see* 38 U.S.C. § 7261(a)(4); *Nolen v. Gober*, 14 Vet.App. 183, 184 (2000); *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990). Therefore, I would hold that the Board's determination that severance of service connection was proper based on a change in diagnosis was not in accordance with the law. 38 U.S.C. § 7261(a)(3)(A). Having found all of the Board's reasons for severing service connection in this case not in accordance with the law, I would reverse the Board's decision affirming severance of service connection.

### D. Congress' Statutory Scheme Regarding Fraud

To be clear, I certainly do not condone obtaining or retaining VA benefits through fraud. I believe, however, that the consequences of severing service connection are so severe that VA must, even in cases where evidence of fraud is present, follow its prescribed procedures. Further, I believe those procedures include developing reasonably raised alternative bases for continuing service connection for the condition for which severance is proposed. It is my view that VA's failure to fulfill its duty to assist Mr. Roberts in developing an alternative theory of entitlement to continued service connection for post-traumatic stress disorder and the majority's condoning of that failure are based *solely* on the admitted repugnance of Mr. Roberts' postservice fraudulent actions. The majority and VA would deny Mr. Roberts, who, by all accounts, served his country honorably, fair process in the pursuit of the severance of his VA disability benefits. In essence, the majority today

43

erects a *total bar* to benefits, not just for Mr. Roberts, but for *any* veteran who commits an act of fraud in the pursuit of his benefits. This position ignores the statutory and regulatory scheme created by Congress to deal with acts of fraud in obtaining or retaining VA benefits.

If Congress wishes to create a *total bar* to benefits for all veterans who commit fraud in obtaining or retaining those benefits, it may certainly do so and has, in fact, done so with respect to certain veterans. *See* 38 U.S.C. § 6103(a) ("Whoever knowingly makes or causes to be made or conspires, combines, aids, or assists in, agrees to, arranges for, or in any way procures the making or presentation of a false or fraudulent affidavit, declaration, certificate, statement, voucher, or paper, concerning any claim for benefits under any of the laws administered by the Secretary . . . shall forfeit all rights, claims, and benefits under all laws administered by the Secretary."); 38 U.S.C. § 6103(d)(1) ("After September 1, 1959, *no forfeiture* of benefits may be imposed under this section or section 6104 of this title upon *any individual who was a resident of, or domiciled in, a State at the time the act or acts occurred* on account of which benefits would, but not for this subsection, be forfeited unless such individual ceases to be a resident of, or domiciled in, a State before the expiration of the period during which criminal prosecution could be instituted." (emphases added)); *see also* 38 C.F.R. § 3.901(d) (2009) (limiting section 6103 to cases where (1) "the person was not residing or domiciled in a State . . . at the time of commission of the fraudulent act," (2) "the person ceased to be a resident of or domiciled in a State . . . before expiration of the period during which criminal prosecution could be instituted," or (3) "[t]he fraudulent act was committed in the Philippine Islands"). In dealing with acts of fraud committed by veterans domiciled in the United States, however, Congress has elected to use the tools of criminal prosecution and the imposition of civil penalties under the Fraud Civil Remedies Act rather than forfeiture. *See* 31 U.S.C. §§ 3801-3812; *Trilles v. West*, 13 Vet.App. 314, 321-22 (2000) (en banc) (discussing the difference between administrative forfeiture for fraud for claimants who are residents or domiciliaries of localities outside the United States under 38 U.S.C. § 6103 and criminal prosecution for fraud for claimants who reside or are domiciled within the United States); 38 C.F.R. Part 42.

In essence, I believe that the fact that Mr. Roberts committed fraud in receiving VA benefits does not relieve VA of its duty to afford him the evidentiary and procedural protections provided for in VA's own regulations, including the duty to assist him in developing evidence. *See Bolton v. Brown*, 8 Vet.App. 185, 193 (1995), (Steinberg, J., concurring ("[W]e cannot now lightly infer that

44

the duty to assist a veteran in developing his claim applies any less to an incarcerated veteran than to a non-incarcerated veteran." (citing *Wood v. Derwinski*, 1 Vet.App. 406 (1991))). For these reasons, I must strongly dissent.

LANCE, *Judge*, concurring in part and dissenting in part: I concur in the majority's analysis of the appellant's PTSD claim. However, I must dissent from part III.E of the majority's opinion, which vacates the Board's decision as to the appellant's claims for dysthymia and depression and remands them for readjudication on a direct basis even though they had previously been granted only as secondary to PTSD. The appellant was ably represented by experienced counsel from the National Veterans Legal Services Program who filed a 30-page brief laying out numerous arguments on appeal. However, the only basis that counsel advanced for remanding these two claims was that they are inextricably intertwined with the PTSD claim. Appellant's Brief at 29-30. Accordingly, I do not believe the majority is justified in sua sponte raising and ruling upon the new theory that it relied upon. *See Ford v. Gober*, 10 Vet.App. 531, 535 (1997) (claims not argued on appeal are deemed abandoned); *Bucklinger v. Brown*, 5 Vet.App. 435, 436 (1993).

I also believe the opinion's reliance on *Jarrell v. Nicholson*, 20 Vet.App. 326 (2006) (en banc), is too cursory. While it may be true that the Board has jurisdiction over all theories within a single claim, it does not follow that it can address all theories in the first instance. *See*, *e.g.*, *Gardner v. Shinseki*, 22 Vet. App. 415, 418 n.2 (2009) (questioning whether *Disabled Am. Veterans v. Sec'y of Veterans Affairs*, 327 F.3d 1339, 1346-68 (Fed. Cir. 2003), permits the Board to address the merits of a claim after reversing an RO decision declining to reopen the claim); *Urban v. Principi*, 18 Vet.App. 143, 145-46 (2004) (per curiam order) (observing that *Disabled Am. Veterans* might preclude the Board from addressing in the first instance new issues raised by a favorable ruling on the issue appealed by the appellant); *Pelegrini v. Principi*, 18 Vet.App. 112, 123 (2004) (noting other regulatory provisions called into question by *Disabled Am. Veterans* to the extent that they appear to permit the Board to consider evidence in the first instance). Accordingly, I also believe that the majority's analysis is too simplistic and could cause confusion.

Therefore, I respectfully dissent from the section of the opinion vacating the appellant's claims for dysthymia and depression.